### HOES v. OCEAN S. S. CO. OF SAVANNAH.

(Supreme Court, Appellate Division, First Department. December 31, 1900.)

1. MASTER AND SERVANT—INJURY TO SERVANT—ESCAPING STEAM—LOOSE VALVE —INSPECTION.

Plaintiff's intestate was an oiler on defendant's steamship, and was fatally scalded by escaping steam. The engines of the vessel had been extensively repaired by another defendant, during which one of the cushion valves of the feed-pump cylinder was removed and replaced. After the repairs, the steamer being about to sail, deceased, in the line of his duty, turned the steam into the feed pump, when the cushion valve, including rod, wheel, and bonnet, blew out. The threads on the valve bonnet and valve seat were uninjured, and the bonnet was put in place and worked satisfactorily after the accident. While it was the duty of deceased to examine the pump before starting it, to see it was all right, it was not his duty to examine the cushion valve; such valves being adjusted when the pump was set up, and not thereafter touched. There was no evidence of any inspection of the engines by the company after completion of the repairs. *Held*, that a finding that defendant was guilty of negligence was proper, since defendant was bound to inspect the engines after completion of repairs, to see they were fit for use, under its duty to provide suitable instruments and a safe place with and in which its employés were to work.

2. SAME—NEGLIGENCE OF FELLOW SERVANT.

The fact that such inspection must have been made by the engineers of the vessel did not render the failure to make such inspection the negligence of a fellow servant of deceased, since such inspection was entirely outside the usual line of duty of the engineers, and was none the less the inspection of defendant because delegated to others.

3. CONTRIBUTORY NEGLIGENCE—EVIDENCE—SUFFICIENCY.

The evidence, showing that a moment before the accident, which he had no reason to expect, deceased was seen reaching up to the throttle valve to turn on the steam, in the ordinary performance of his duty, and that the accident happened only a moment afterwards, justified a finding by the jury that deceased was not guilty of any contributory negligence.

Ingraham, J., dissenting.

Appeal from special term, New York county.

Action by William M. Hoes, public administrator, as administrator of Owen Hagen, deceased, against the Ocean Steamship Company of Savannah and another. From a judgment in favor of plaintiff, and from an order denying a new trial, the steamship company appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Herbert Barry, for appellant.
Franklin Pierce, for respondent.

VAN BRUNT, P. J.  This action was brought by the public administrator in behalf of the next of kin of Owen Hagen, who on September 13, 1898, while in the employ of the Ocean Steamship Company as an oiler in the engine room of the steamer City of Augusta, then lying at pier 34, North river, was so severely scalded by the escape of steam that he thereafter, on October 3, 1898, died. The accident, it was claimed, was caused by the negligence of the defendants, and occurred between 11 and 12 o'clock at night, just before the steamer sailed from her dock.  For two or three weeks prior thereto the steamer had been undergoing repairs, which were made by the Morgan Iron Works.  On the night in question the plaintiff's intestate was at his post, on the lower grating of the engine room, and stooped over, in performance of his duties, to the feed pump, which was used to pump water from the condenser back into the boiler, and turned on the throttle valve to let steam into this feed pump.  Part of the fittings of this pump are two cushion valves; their purpose being to permit a cushion of steam to be formed in the steam cylinder, so that the piston will not strike against the head of the cylinder with too much force.  When Hagen turned on the steam one of these valves came out, and by the steam escaping through the opening he was scalded.  It is claimed by the defendants that he was scalded by hot water as well as steam, but there is no evidence that there was any hot water.  At the time of the accident, another oiler, William Cox, was near the foot of the ladder; and Henry M. Wilson, an assistant engineer, was standing on the middle grating, just above, and he immediately turned off all the steam.  Edward M. Stanford, another assistant engineer, was also on the middle grating, and went down the ladder, and found upon the floor, beside the feed pump, the rod and wheel, together with the bonnet of the cushion valve.  The bonnet is the part of the valve which screws into a seat or casting, and through which the stem of the valve works.  None of the threads of the bonnet or of the seat were broken or torn, and the valve and bonnet were replaced upon the cylinder and screwed up, and thereafter used.  There is no evidence that they had been imperfect in any way.  The house surgeon of the hospital to which Hagen was taken testified that the cause of his death was intestinal perforation, the effect of burns and scalds, which he described as covering a considerable area.  He referred to the injuries as due to steam, but no mention was made by him or any other witness of hot water as causing the injuries in question.  It was testified that steam condenses to hot water in the cylinder, and that drain cocks are provided in the bottom of the cylinder for letting such water out, and that when the pumps are first started there is considerable hot water from condensation of steam.  It was further testified:  That the pumps were generally full of water, which runs out through the drain cocks, and should be so allowed to run out. That the blowing out of hot water and steam makes a noise something like when a locomotive is started up,—the noise of escaping steam, a sort of rushing sound.  There is no danger attendant on starting the pump in that way, with the steam gradually admitted; and with the drain cocks open, if anything should seem to be wrong,

the open drain cocks would reduce the pressure. Mr. Cox testified that in starting up the pump the first thing is to open the drains and let all the water escape out of the cylinders; then the exhaust is to be opened, and the next thing to be done is to open the steam valve,—the throttle; that this should be opened very easily, by degrees,—just "cracked" a little to let a little steam in. There was other testimony that the oiler, in connection with the starting of the pump, was to take a hand lamp and oil can, and inspect and oil things thoroughly before there was anything done whatever. There was also testimony that before the accident the rushing sound of blowing out hot water and steam from the drain cocks was not heard, and that it was the oiler's duty to examine the condition of the pumps, and see that they were all right before he started them. One of the witnesses testifies: "He must look them over. If he finds anything loose, he must tighten it up,"—and it was his duty to be familiar with all the working of the pump. The evidence further shows that the oiler is not merely a man who goes around and puts oil on parts of the machinery, but that the oilers are working their way up to the position of engineers. The evidence further conclusively shows that the oiler should do nothing to these cushion valves, that they ought to be let alone, and that oilers, when they first come on board, are told not to touch these valves. The engineer of the company that manufactured the pump testified that the proper way was to adjust the cushion valve when the pump is set, and then not have people tamper with it. There is evidence that this cushion valve had been removed by the employés of the Morgan Iron Works when they were repairing the circulating pump. It was claimed upon the part of the defendants that the officers of the ship knew nothing of the taking out or removal of any of these cushion valves; but it appeared that the first engineer had been told by the employés of the Morgan Iron Works that they thought it would be necessary to take the cushion valves out, and he also testified that he had a further talk with the workmen, and they said that there would be no occasion to disturb the valves. The person with whom he had the conversation was the foreman in charge of the machinists. There was evidence that these cushion valves were taken out, and that they were seen lying on top of the pump. There is no evidence whatever that there was any inspection made of this pump by the engineers of the steamer after the repairs were made, and prior to the happening of the accident.

The question which is presented upon this appeal is as to whether any such duty of inspection, under the circumstances, rested upon the engineers of the steamship, and whether, if such duty was not performed, it was not the negligence of a co-employé. The principle is familiar that an employer is bound to use reasonable diligence in the furnishing of suitable instruments with which his employés shall work, and also to use reasonable diligence in furnishing them with a safe place in which to work. The exact cause of the happening of the accident in question is not apparent. If the bonnet of the valve had been screwed on as it should have been, it could not have been blown out without tearing the threads of both the valve and

the seat. As has been observed, there was no evidence whatever, upon an examination of this valve, that the threads were injured at all. If it was merely put into the seat loosely, without any of the threads being caught, it would have come out before there was such a pressure of steam as evidently had accumulated prior to the time when Hagen was scalded. It is claimed upon the part of the appellant that it was Hagen's duty to examine this pump and see that it was in order. But the evidence in respect to these cushion valves is that Hagen had no duty in regard to them; that he was not authorized to meddle with them or to touch them in any way. Therefore, if they were out of order, it was no negligence upon his part not to examine them to see that they were in order, as he had a right to assume that they were in fit condition at the time he went to the pump for the purpose of turning on the steam. It was the duty of the employer, under the circumstances, after this machinery had been in the hands of the machinists for the purpose of making the extensive repairs which seem to have been made upon this ship on this occasion, to see that the machinery was in proper order before it was attempted to be used. And it is no answer to this proposition to say that that was the duty cast upon the engineers of the ship, who were the co-employés of the deceased, because it was a master's duty to see that the machinery was in proper order for use before it was attempted to be used; and, if this duty of inspection was delegated to anybody else, it was still the inspection of the principal, and, if neglected in its performance, it was as much in fault as though the master had been guilty of the neglect. It was entirely different from the ordinary routine of work to be done by the engineers in the running of the machinery. It was a fulfillment of the duty required of the owner to see that the instruments with which his employés were to work were in proper condition for use.

It is further claimed that there is no proof that Hagen was free from contributory negligence in causing the happening of this accident. It is true, his mouth is sealed in death. But the evidence discloses that he was in the ordinary performance of his duty at the time of the happening of this accident, which he had no reason whatever to anticipate. He was seen to be stretching his hand up towards the throttle valve but a moment before the happening of the accident, which it was necessary for him to do in order to turn on the steam; and then in a moment thereafter this rushing sound of steam was heard, caused by the fact that the bonnet and stem of the cushion valve had blown out from the seat. From these facts the jury had a right to determine that the deceased had been guilty of no act which in any way tended or contributed to the happening of the accident, and that the defendant was guilty of negligence in not having made an inspection of this machinery after it had been in the hands of the machinists, in order to assure itself that it was in proper order for use. There was considerable said in regard to the drain cocks being open, but if this cushion valve had been in position and properly secured, even if the drain cocks were shut, the cushion valve would not have blown out as it did.

Upon the whole case, therefore, we are of the opinion that the

questions were properly submitted to the jury, and that the judg-
ment and order appealed from should be affirmed, with costs.

O'BRIEN, McLAUGHLIN, and HATCH, JJ., concur.

INGRAHAM, J. (dissenting). I do not concur in the affirmance of
this judgment. The jury were instructed that they could find the
defendant guilty of negligence if, in the exercise of reasonable care
in the discharge of its duty, the defendant should have discovered
either the omission of this valve, or, after its return, the imperfect
manner of its return. The defendant then requested the court to
charge that:

"The duty of inspecting this pump was one that devolved upon Hagen, or
upon a co-servant of Hagen; and, if the accident happened by reason of the
neglect of such co-servant, the Ocean Steamship Company is not liable."

This request was refused in that form, and the defendant except-
ed. The liability of the defendant was thus expressly confined to its
negligence in the discharge of this duty of inspecting this pump prior
to its use by the plaintiff's intestate, or in failing to report the de-
fect. The defendant was a corporation, and necessarily had to dele-
gate this duty of inspection to servants appointed by it; and I think
that if the servants appointed, whose duty it was to inspect, failed
in that duty, no one of such servants upon whom such duty devolved
could recover, as the negligence was that of a co-servant, for which
the defendant was not liable. It seems to me that the distinction
must be drawn between those servants of the defendant, regardless
of their character or standing, who were charged with the duty of
inspection, and those upon whom no such duty devolved. It was
said that the duty devolved primarily upon the first assistant en-
gineer, and, certainly, if that engineer had neglected that duty, and
he had been injured in consequence of such negligence, he could not
have recovered. And so, if any servant of the defendant standing in
the same relation to the master as to the particular duty which it
was alleged was neglected, were negligent in the performance of that
duty, then such negligence would be that of a co-servant, for which
the master would not be responsible. In this case the evidence is
uncontradicted that this particular pump had not been repaired with
the other machinery, that it was in perfect repair at the time those
other repairs were commenced, and that no necessity existed for re-
moving these cushion valves. The assistant engineer, who was call-
ed by the plaintiff, testified that the foreman of the Morgan Iron
Works had informed him at one time that it would be necessary to
remove these cushion valves, but had subsequently informed him
that it would not be necessary, and that they would not be touched;
and this evidence was not contradicted. The foreman of the Mor-
gan Iron Works testified that he had said to the assistant engineer
that the valves would not be removed, and that, as a matter of fact,
they were not removed. There is no evidence that the defendant or
any of its officers had any knowledge that these valves were re-
moved. An employé of the defendant, not connected with this de-
partment, testified that four or five days prior to the accident he saw

the valves removed from their position and placed upon the top of the pump; that subsequently and on the same day he found the valves replaced, and, upon testing them, found them secure. This was the only evidence to justify a finding that the valves had been removed, although, from the condition of the valves after the accident, it was apparent that they had been taken out of the pump. There was, however, nothing to call the attention of the defendant to the fact that these valves had been removed, or that any inspection of the pump was necessary. The testimony is uncontradicted that the plaintiff's intestate held the position of what was, in effect, an assistant to the engineer; and I think that he was a co-servant with the engineer in the discharge of this duty of managing and inspecting this machinery. In the first place, to make it the duty of the defendant to inspect this pump, there must have been some notice to the defendant or its agents that for some reason it had become out of order or needed repair. Before negligence could be predicated upon a failure to inspect, it certainly must appear that for some reason a prudent person would consider an inspection necessary. There was no evidence here to justify the slightest suspicion on behalf of the agents of the defendant that this pump was out of order, or that inspection was necessary. The plaintiff's intestate was entirely familiar with the operation of this pump and his duty in relation thereto. He had been engaged in operating this machinery for several years, and, if it was negligence to start this pump without testing these valves, he, being in charge of the pump, with knowledge of its construction and method of working, was as guilty of negligence in not making the proper test as was the engineer or his assistants who were on duty in charge of other parts of the machinery. This conclusion, I think, is in accordance with the rule laid down in Crispin v. Babbitt, 81 N. Y. 516. Judge Rapallo there says:

"The liability of the master does not depend upon the grade or rank of the employé whose negligence causes the injury. A superintendent of a factory, although having the power to employ men or represent the master in other respects, is, in the management of the machinery, a fellow servant of the other operatives."

In the application of this rule, it seems to me that any negligence that could be predicated upon a failure to inspect was either the negligence of the plaintiff's intestate or his fellow servant. Whose duty was it to inspect this machinery? The defendant was a corporation, and had to appoint agents to perform this duty. It appointed a chief engineer, assistant engineers, and other employés, designated as "oilers," but whose real duty was to act as assistants to the engineers. In the management and control of the engines, it seems to me that all of these employés were co-servants, and that the chief engineer, or any other engineer, was, as said by Judge Rapallo in Crispin v. Babbitt, "in the management of the machinery, a fellow servant of the other operatives." I think, therefore, upon this evidence, the negligence, if any, was that of either the plaintiff's intestate or his fellow servant, for which the defendant was not responsible.

There was also a request to charge, which was refused, to which I think the defendant was entitled. The only evidence that the accident caused the death of the intestate was the testimony of Dr. Curtin, who was a house surgeon at St. Vincent's Hospital when the plaintiff was carried there after the accident. He testified that the plaintiff's intestate was brought there on September 14th, and that his condition continued to improve until the 3d of October, when he suddenly died. The witness stated that in his opinion the cause of his death was intestinal perforation, the result of burns. This witness had been in practice about 18 months at the time of the accident. Upon his cross-examination he testified that the burns were not of a serious character, being known as either of the first, second, or third degree; that none of the burns extended below the true skin; that his fever lasted about a week, and after that he commenced to take solid food; that during the second week the wounds gradually improved; that all of the burns of the first and second degrees healed up and disappeared; that the only wounds then unhealed were upon his thigh; that he was allowed to be dressed and to sit up in bed, and was progressing favorably, when, on the 3d of October, his death came very suddenly; that he raised up in bed, and then dropped back, collapsed, and died in 10 minutes; that these were the first symptoms indicating that his condition was any more serious than it had appeared at any other time; that he never saw a case of intestinal perforation resulting from a burn, and that this was merely a matter of opinion. The defendant called a witness, who, it was admitted by plaintiff's counsel, qualified in every respect as an expert. He testified that in his opinion the plaintiff's intestate did not die from the burn; that, in cases where death comes from a perforation, it is preceded by severe pain for 48 hours, and that the witness knew of no case where the patient had not lived at least 21 hours after the occurrence with intense pain; that the symptoms in such a case are those of peritonitis at the beginning,—constant pain and rise in temperature, a very rapid pulse, and all attendants of such a condition; that in no recorded case have the symptoms been less than 21 hours before death; that "if the first symptom was the collapse attendant on an effort to rise, and not preceded by fever, and death resulted in ten minutes, that would exclude a perforation of the duodenum (that is, that the death was caused by it)." Counsel for the defendant asked the court to charge that "the jury are not bound to believe the testimony of the plaintiff's medical witness as to his opinion that Hagen's death was due to accident." That the court refused to charge, and the defendant excepted. The court had charged the jury that the plaintiff could not recover unless they believed that Hagen's death resulted from the injury sustained by him on September 14, 1898. But, considering the character of the testimony, and the rather remarkable evidence of this expert called by the plaintiff, I think the defendant was entitled to have the jury instructed that they were not bound to believe this opinion of the plaintiff's expert, and that a refusal to charge the request was error.

For these reasons, I think the judgment should be reversed.