## HAILEY-OLA COAL CO. v. PARKER *et al.*

No. 1652.   Opinion Filed March 12, 1912.

Rehearing Denied April 9, 1912.

(122 Pac. 632.)

1.   **MASTER AND SERVANT**—Injuries to Servant—Dangerous Appliances.   The mere purchase of an instrumentality, such as oil, from a reputable dealer, is not alone sufficient to excuse the employer, in case of injury received in its use, but, in addition to this requirement, is coupled the duty of such reasonable examination and inspection as is practicable by a prudent man under similar circumstances.

2.   **SAME**—Negligence of Master—Question for Jury.   Whether or not the company was negligent in the purchase and furnishing of a safe instrumentality, such as lubricating oil, for the use of miners in a coal mine, is primarily one of fact, to be determined under proper instructions by the jury from all the facts and circumstances of the whole case, and where the issue has been properly submitted, and the verdict regularly returned, the finding of the jury will not be disturbed in this court on appeal.

(Syllabus by Robertson, C.)

*Error from District Court, Pittsburg County;*
*Preslie B. Cole, Judge.*

Action by M. E. Parker, for herself and as next friend of Oris, Ray, Harold, and Thelma Parker, minors, against the Hailey-Ola Coal Company for damages on account of the death of William Parker, husband and father.   Judgment for plaintiffs in the sum of $7,500, and defendant brings error.   Affirmed.

This was an action by M. E. Parker, widow of William Parker, for herself and as the next friend of her four minor children, against the plaintiff in error, the Hailey-Ola Coal Company, defendant below, to recover damages on account of the death of the husband and father, which, as is alleged, was occasioned by suffocation, caused by the dense volumes of smoke incident to a fire which started at the bottom of a mine belonging to defendant coal company, and in which said William Parker was at work as a miner.   The plaintiff charged that defendant

company was liable in damages for his death on account of the following negligence and wrongful acts of defendant company, which caused the fire and smoke and which primarily resulted in the death of the deceased, to wit: (1) That an inflammable oil or grease was sent into the mine on the day of the accident. (2) That such inflammable oil or grease was handled in open tubs, and in close and dangerous proximity to open lights. (3) That, upon the ignition of this inflammable oil by being brought into proximity to an open light, the representative of the defendant company, in charge of the mine, overturned and poured out the oil upon and around the bottom of the shaft, thus igniting the shaft bottom and the walls of coal and the grease and oil soaked timbers and roadway. (4) That the company was guilty of an absolute violation of the mining laws of Oklahoma in maintaining an oil room down in its mine, and oiling and greasing its cars therein, and thus greatly increasing both the extent and volume of the fire and smoke. (5) That after the fire commenced the fan carrying air into, through, and out of the mine was stopped, thus stopping the withdrawal of the smoke. (6) That while the fire was in progress, and before the deceased and other employees had escaped, the opening of the shaft at the surface of the ground was sealed, thus further preventing the escape of smoke from the shaft, and forcing it down and into all parts of the mine and upon the men yet remaining therein.

The company answered these allegations of plaintiff's petition by general denial, also by way of an affirmative defense that the oil complained of was purchased of a reputable company, under representations that the same was black oil, suitable for the oiling and greasing of the cars for which it was intended, and sought to be used, and was noninflammable, and that it had no means of knowing, or ascertaining, that said oil was inflammable, but relied upon the representations of the company from which it was purchased. The defendant company further alleged as an affirmative defense that the deceased was guilty of contributory negligence, in failing to escape upon being warned

of the fire, and upon being directed to follow the person giving the warning, who knew of a way of escape other than by the bottom of the shaft, which at that time was impassable because of the flames and smoke. At the trial, however, there was no attempt to deny the inflammability of the oil, nor the taking of said oil into the mine, in open tubs, exposed to open lights, such as were used by miners; nor the ignition of the same by reason of the proximity of the same to the open lights, nor the overturning of the tubs of burning oil by the pit boss, nor the violation of the law in maintaining, down in the mine, a grease room, and the greasing of cars therein, nor the stopping of the fan used to secure air for the mine, upon the sealing of the shaft. Neither was there any evidence offered in support of the charge of contributory negligence on the part of the deceased; nor was it claimed that the cause of the death of deceased was other than the fire and smoke originating as above stated, and the inability of deceased to escape by reason of the fire and smoke before he was overcome and suffocated. The entire defense, as can be gathered from the record and the brief of defendant company, rests upon the claim that the company was excused from all consequences of the use of the inflammable oil by reason of its purchase from a reputable concern and a reliance upon the representations as to its character. There was some evidence offered to show that the greasing of the cars in the mine in violation of law did not contribute to, or increase, the extent or effect of the fire and also that the stopping of the fan did not increase the danger to the men, and that the men, 29 in number, were all probably dead before the mine was sealed.

At the time of the fire the general manager of the company, Mr. James Elliott, was at Niagara Falls, N. Y. He read an account of the accident in a newspaper and arrived at the scene of the disaster several days after it had occurred. He had been gone from Haileyville, Okla., where the mine is located, about four weeks. Prior to his going he had been called upon by a salesman of the Globe Oil Company of Cleveland, Ohio, who informed Elliott that he had a car load of oil at Ft. Smith

that he was trying to get rid of and desired Elliott to take some of this oil, representing it to be black oil, which is the sort of oil used for greasing mine cars, and Elliott agreed to take ten barrels from him. Then Elliott went away, and was not present when the oil arrived. This was the only black oil, or oil for greasing cars, ever purchased by the defendant company from the Globe Oil Company, although it had previously bought some engine oil, and some cylinder oil, from this company. Elliott therefore had had no previous experience with, or personal knowledge of, the black oil sold by this company. It came in barrels, labeled "Black Oil," and these barrels were placed in the oil-house of the company, near the top of the shaft, wherein oils of all character were kept. Previous to the receipt of these ten barrels of oil, the company had been purchasing its black oil from a local agency, which brought it in cans without labels, and emptied the cans into a tank in this house. For about six or seven days preceding this accident oil out of this ten barrel lot had been used without accident at the rate of about a barrel a day. The method of using this barrel oil was to open a barrel on the surface of the earth, in broad daylight, near the top of the mine, and draw it off into half barrels of wood, which were fitted with handles, and without cover over the top, lift these half barrels, or tubs, as they were called, upon the cage, and send the oil down the shaft, from which point it was again carried to the grease room about 75 feet from the bottom of the shaft. The drawing of the oil from the barrels into these open tubs at the top was done under the direction of the top boss, who had the work of delivering the oil to the employees, whose business it was to use it, delegated to his charge. While these open tubs were being filled, on the morning of the fire, employees engaged in the work and others who were at the shaft mouth, with no duties whatever in respect to the handling of the oil, noticed a difference and peculiarity in this oil. They noticed that it was thinner, of a bluish color, and that it smelled differently from black oil, some of them recognizing a smell of gasoline or coal oil. The top boss, who should have examined the oil, but, instead, only

incidentally happened to be near while it was being drawn, and his fifteen year old boy, testified that they noticed no difference in smell or otherwise. When three tubs of this oil, amounting to 50 or 60 gallons, arrived at the bottom of the shaft, the employees of the company there, using open lights, sought to take these tubs of oil from the cage, and in doing so one of such employees noticed the smell, but, being in the dark, could not, of course, see the different consistency or color. As he was about to remove the tub, his miner's lamp came within six or seven inches of the surface of the oil, and the oil at once ignited in one tub. While still contained in the tub, this employee and another one endeavored to extinguish the flames by pouring water into the tub, there being a space of some six inches from the surface of the oil to the top of the tub. This greatly reduced, but did not entirely extinguish, the flames, and the officer of the defendant company in entire charge of the underground came to the bottom, and, seemingly crazed with fear, seized the tub with his bare hands below the line of fire, and emptied out the burning oil upon the bottom, and then sought to signal the engineer to hoist the cage, but was too excited to make the proper signal. Immediately all the employees about the shaft bottom sought to escape, the foreman in charge, with one or two others, ascending by means of the cage, and others traveling out of the mine through an opening about a mile away. When the foreman arrived at the top, he immediately hastened to the fanhouse and stopped the fan, returned then to the top of the shaft, where, seeing the flames come pouring up the shaft, he immediately returned to the fanhouse, and started it going again, after which, and after himself and others had sought to enter the mine through the fan shaft, but were driven back by the smoke, he then caused the mouth of the shaft to be sealed; that is, covered with boards, canvas, and earth, to prevent the draft of air bringing the smoke and flames up to the top, where it might have set fire to and destroyed the buildings about the top of the mine.

Of the men employed in the mine those in that portion known as the Pea Vine slope were the ones most endangered by the

fire, and the only ones whose escape was practically cut off by the fire at the bottom of the shaft. Their mode of ingress to their working place was, first, by the shaft, then through the oil or grease room to the top of the Pea Vine slope, a distance of a few hundred feet, and then down to a still lower depth in the earth to the various entries on the Pea Vine slope, and to get out they returned by the same route. The deceased, William Parker, was at the bottom of this Pea Vine slope, and his body, with that of 28 others, was found near the top of the Pea Vine slope, where they had all rushed in an endeavor to escape through their only known mode of egress, viz., to the bottom of the shaft and up. Those who were in other portions of the mine, between whom and daylight no burning shaft bottom and grease room was interposed, traveled through old workings to another opening about a mile away, and so also did a few of those upon the upper entries of the Pea Vine slope, who were led through old abandoned workings through holes and cut-throughs. The deceased had been at work in the mine about twelve days. Dying with him, and seeking to escape, as he did, were at least two of the oldest employees in the mine. Two of the witnesses for plaintiff, one of whom had performed duties making him more familiar with the mine than the coal diggers, such as deceased, themselves knew of no mode of escape, and would have perished had they not been near the top of the Pea Vine slope, and shown the way out by one of the very few who knew. The condition of the mine and of the airways was such that all of the smoke from the fire descended the Pea Vine slope to the bottom where the deceased was at work, and ascended part way back through a parallel air course.. The first warning deceased could have of the fire was the arrival of the smoke coming down the slope, and his only possible mode of escape was to go back against the smoke up the slope, or travel with the smoke, a mile or more to its outlet, either of which entailed certain death, regardless of which he chose.

There is testimony that one man started down the slope, endeavoring to warn those nearer the bottom, and possibly in-

cluding Parker, at the very bottom, but this man by doing so also lost his life, it being as impossible to get to Parker as for him to get out. There was proof, uncontradicted, that the oiling and greasing of cars had been carried on at this grease room, or empty track, near the bottom of the shaft, for months preceding the fire, and that the waste oil and grease about the track and the bottom was two or three inches deep in places. So deep was it that boards were laid across the ties to enable the men from the Pea Vine slope in coming from work to the shaft bottom to avoid walking ankle deep in the oily ooze and grease. There was no proof to the contrary, and no proof whatever that any cleaning up was ever done, but that the place upon the morning of the fire as the men went to work was in its usual condition, and that as above stated. The evidence of plaintiff showed that the fire burned into and through this grease room. Evidence of employees of the defendant company was conflicting in this respect. There is conflicting evidence as to the propriety of stopping the fan. The only evidence of the defendant company of a reason for sealing the shaft was that, considering the men all dead at the time it was done, it was the best thing to do to insure the recovery of their bodies, but the result of sealing the shaft and preventing the escape of the smoke that way, in the event that the men might still be living, and that it would force the smoke upon them in denser volumes, was not denied.

There was no evidence that any test of any kind, any inspection, or even any visual examination was made of the black oil, being taken from the barrel, while running into the open tubs, or before being sent into the depths of the mine, to ascertain that it was noninflammable and the sort of oil needed. The testimony of the witnesses Massey, Walls, and Thomas, all old experienced miners, who had worked for many years in this same mine, and yet would have undoubtedly lost their own lives, had they not been so fortunately stationed as to be out of the main direction of the smoke when the fire started and able to attach themselves to a party, being guided through the intricate byways

of the mine by one of the few familiar with the mode of egress
other than by the shaft, shows the extent and character of the
journey necessary to be made by one seeking to escape from this
Pea Vine slope through the abandoned workings of the mine in
order to avoid the burning shaft bottom.  It was necessary for
them to travel a distance of a mile or more underground through
the narrow entries and passageways of the mine, so low as to
compel them to go in a stooping position, and most of the time
in absolute darkness.  Much of this traveling also was done up
a steep incline.  In order to get from one entry to another, it
was necessary to go into one of perhaps a hundred rooms, all
exactly alike, one only having a hole or opening through which
they might crawl to the entry above, and if one entered the
wrong one of these rooms, after pressing up to the highest
part of that room, then it would be necessary to retrace one's
steps and try again, so that without a guide it would have been
necessary to try each successive room of 50 or more.  Even
following a guide, who knew which room to select, it was
necessary at times to scramble over falls of rocks, six or seven
feet high, to squeeze through an opening of but two or three
feet between the roof and this jagged pile of rocks.  And this
traveling must necessarily be done with the utmost haste because
behind them the smoke was approaching, after having first trav-
eled to the bottom of the Pea Vine slope.  The deceased, Parker,
was at the bottom of the Pea Vine slope, and upon the arrival
of the smoke at his working place, which would be his first intima-
tion of anything wrong, he had not only to traverse the mile of
distance and surmount the obstacles and difficulties met by the
others, but in doing so he would be traveling, not ahead of the
smoke, but enveloped in it, and he sought to escape in the one
possible way other than the shaft.  Did he seek to get to the
bottom of the shaft, the only egress known to him, he would be
equally enveloped in smoke; but upon his arrival at the top of
the Pea Vine slope would, and did, find further progress barred
by the roaring fire.  It is significant that the way of escape sought
by the deceased was also sought by some 28 others, two of

whom were men of the longest experience in this mine, and they all died together. And this same route was the one upon which even those escaping instinctively started, and were themselves saved by reason of being higher up the slope, and having still time, after finding someone familiar with another way of escape, to travel this new route before the smoke ascended to them from the deceased's working place, some thousand feet or more below. It also appears from a signed pleading that the defendant company has asserted, or intends to assert, a claim for damages against the Globe Oil Company for selling to it, the defendant company, this inflammable oil, under the guise and label of black oil. Upon the issues, and evidence above stated, and further proof that deceased was 34 years of age, and earning from $75 to $80 per month, sober, industrious, and spending all of his earnings upon his family, and leaving behind him a widow and four minor children, all under the age of 20 years, the jury returned a verdict in favor of plaintiff for $7,500, and from the judgment pronounced upon this verdict the company has appealed.

*Stuart, Gordon & Liedtke,* for plaintiff in error.

*E. J. Smith* and *Kellogg & McMillan,* for defendants in error.

Opinion by ROBERTSON, C. (after stating the facts as above). Counsel for plaintiff in error have assigned 47 distinct specifications of error, but in their brief they state that:

"Without waiving a single specification of error, and insisting on all, but in order to save time, we will group together such specifications of error as are cognate and involve directly the same question, and will therefore take up specification No. 3," etc.

While on page 5 of their brief they say:

"The sole question as to the oil, which really is the important question in the case, was whether the plaintiff in error exercised that care which the law requires in sending the oil down into the mine. * * * But, when the court has read all the evidence in the case, it will, no doubt, conclude that the real

question in this case was and is with reference to the negligence of the plaintiff in error in carrying the oil down into the mine, which oil was ignited, and which ignition was the primary cause of the destruction of life and property."

. It might be well, also, to note that the only alleged errors treated by plaintiff in error in their brief relate to instructions requested by defendant in the lower court, and to instructions given by the trial court. Therefore, the real question in the case, as agreed upon by counsel for both parties, is whether or not the defendant was negligent in furnishing inflammable oil, instead of noninflammable oil, for use at the mine, w'thout further information or attempt to acquire information, in respect to its inflammability, and without inspection or examination beyond the representations of the manufacturer and the label on the barrel, and, this being true, a full and complete knowledge and understanding of all the facts and circumstances of the whole case becomes imperative; hence the exhaustive statement which precedes this opinion.

For convenience the plaintiff in error will hereinafter be called the company, and the defendant in error the plaintiff. The company, on page 14 of its brief, charges that the main complaint of plaintiff in that inflammable oil was by the company permitted to go into the mine, and which was ignited, and which ignition produced the condition which caused Parker's death, and that, therefore, the vital questions are: What kind of oil did the company send into the mine? Where the oil was obtained, and the conditions under which it was produced, together with the degree of care used by the plaintiff in error in such purchase, and in furnishing the same for use in its mine after it was purchased?

After reviewing the testimony of James Elliott, manager of the mine, which shows that he purchased ten barrels of oil from the Globe Oil Company of Cleveland, Ohio, that said company was a reputable concern, selling oil in the open market for the purpose for which this oil was used, that said oil was marked "Black Oil, Globe Oil Co., Ft. Smith, Arkansas, Head-

quarters, Cleveland, Ohio," on the card, and "Black Oil" in big letters on the head of the barrel, also the testimony of John Smith and others, detailing the manner in which the oil was pre-pared, and sent into the mine, in which there is evidence that it looked and smelled different from the ordinary black oil, the company lays down, and seemingly relies upon, the general rule that where the master goes into the open market and purchases an instrumentality like oil, to be used for the simple purpose of greasing cars in the mine, and the purchase made by the mas-ter is from a reputable dealer, engaged in the manufacture and sale of oil, it is *prima facie* evidence that the master has done his duty toward the servant, and unless something intervenes between the purchase made, and the use of the oil by the mas-ter in his mine, which would lead him to believe that the oil was not what it was represented to be, there can be no action-able negligence; and also upon the theory that the master does not insure the instrumentality which he furnishes to his servant in doing his work, but that the care demanded of the master by the law is that care which a prudent man would exercise under like circumstances, considering at all times the facts and circum-stances of the whole case, the company seeks to avoid responsi-bility for Parker's death. The rule as stated above is accepted by the plaintiff as a correct exposition of the law applicable to the case at bar, but counsel for plaintiff contends that the ques-tion of whether or not the master used such care as a prudent man would exercise under like circumstances, considering at all times all the facts and circumstances of the whole case, is pri-marily a question to be determined solely by the jury, under proper instructions by the court, but that, when once so deter-mined, its answer is final and binding both upon the trial and appellate courts. Of the latter phase of the question, consid-eration will hereinafter be given. As to the former, let us first examine the authorities cited by the company in support of the rule contended for.

The first case in support of the above rule cited by the com-pany is *Allison Mfg. Co. v. McCormick,* 118 Pa. 519, 12 Atl.

273, 4 Am. St. Rep. 613, in which a workman was ordered by his employer to paint the inside of a water tank, twelve feet deep. He entered the tank with a lamp and began work. Soon after an explosion occurred in the tank, resulting in the death of the workman. It appeared that the paint used contained a large quantity of benzine; that it was a well-known paint, and had been in use many years; that the employer had used it for ten years, purchasing it in large quantities from the factory ready for use. The court held in that case that the accident was outside the range of ordinary experience, and that the employer, under the facts as detailed in the evidence, was not negligent. In the extract from the opinion in that case as found on page 17 of the company's brief herein, it is clearly shown that the basis of the opinion of the court was that the material which caused the injury had been in use by the master for ten or twelve years without accident. The workmen in that case were sent in to work and were discharging their duties under the immediate direction and supervision of a competent painter. The main difference between the facts of that case and the one at bar is that in the latter the master had never before made use of the sort of oil furnished the servants which caused the fire, nor the kind of oil sold by the Globe Oil Company, which this lot purported to be. In this case, too, it was a fact well known to the company that the oil sent into the mine would be brought into close proximity to the miners' lamps, and the miners, knowing this, had a right to rely upon the employer using such reasonable care as would prevent the sending down into the mine oil of an inflammable character. The oil was not sent into the mine by, or under the supervision of, a competent man, used to handling such oil, although this was a duty owing by the company to the miners, nor was the oil inspected or examined in any way by the company, notwithstanding some of the workmen, who assisted in sending it down into the mine, noticed that it was of a different color, and had a different smell, from that previously used.

In the case of *Grand Rapids Ry. Co. v. Huntley*, 38 Mich. 537, 31 Am. Rep. 321, the court held that the purchaser has a right

to assume the goods bought from a reputable dealer are in good condition, if they seem to be so, on such inspection as is reasonable and practicable. It is thus seen that the rule contended for by the company is modified by this decision, so that, before the employer can rely upon this doctrine as excusing liability, he must show such an examination as is practicable and exercised among prudent men in using such instrumentality. This, too, was a railway case, involving the rights of a passenger, and hence a much higher obligation was required of the master than in a case where the interests of the servant are involved. However, it is seen by this decision that the mere purchase of this instrumentality from a reputable dealer is not alone sufficient to excuse the employer, but that with this requirement is coupled the duty of such reasonable examination as is practicable by a prudent man under similar circumstances. What was a reasonable examination and inspection under the circumstances of the case at bar, like other issues of fact, was for the determination of the jury.

In the case of *Fuller v. N. Y. H. H. & H. R. Co.*, 175 Mass. 424; 56 N. E. 574, which was an action for damages occasioned by the breaking of a glass tube under steam pressure, without a protecting guard, it was ascertained that there was no defect in the appliance. The pressure of the steam was too great for the tube to stand, and it burst. There being no defect, there would have been nothing gained by an inspection by the master, and, even though there had been an inspection, it would not have resulted in the use of a different tube, and hence the question of inspection did not enter into the consideration of that case, and the same would not be applicable to, or of any value to us in the consideration of the present question.

The next case cited is *Shea v. Wellington*, 163 Mass. 364; 40 N. E. 173, which was an action for damages for injuries occasioned by the use of a defective "exploder" in a stone quarry. The extract from the opinion in this case, found on page 18 of the company's brief, shows that "It appeared that the ex-

ploders were manufactured by one of the largest manufacturers' in the country; that they were packed in boxes ready for use; *that, in order to inspect them, it would be necessary to employ an expert at a great expense.*" Thus the effect of that opinion is really in support of plaintiff's contention. In the case at bar an inspection could have been made at the time the peculiarity in the color and smell of the oil was observed, and before the same was sent down into the mine, without the employment of an expert, and without the waste of a minute of time, and by the expenditure of a match, and a handful of waste, or piece of wood.

In *Reynolds v. Merchant's Woollen Co.,* 168 Mass. 501, 47 N. E. 406, another case cited by the company in support of this rule, it appears that an employee was injured by the flying apart of a cylinder, which had been recently purchased of a reputable manufacturer. An examination of this case shows that the court held that, before the employer would be absolved from liability, he must not only use care in purchasing the machinery from a reputable manufacturer, but, in addition, he must inspect the same before putting it in operation. On page 501 of 168 Mass., page 406 of 47 N. E., the court uses the following language:

"Mill owners usually procure their machines of reputable makers. Such conduct meets the standard of ordinary care, and it is not negligence on the part of an employer to place it in his mill, and, *after proper inspection,* to use such machinery so bought."

In 1 Labatt on Master and Servant, p. 327, it is said:

"There are at least two very weighty reasons why the theory that a master is entitled as a matter of law to rely on the quality of the appliances obtained from a reputable manufacturer should be rejected. One of these is that such a theory is essentially inconsistent with the doctrine of nondelegable duties. As between masters and servants, this doctrine should, it is submitted, always be regarded as controlling, whenever it comes in conflict with the declaration that the employer of an independent contract is not liable for his negligence. The other reason is that, according to the rule adopted by most of the authori-

ties, the servant has ordinarily no right of action against the manufacturer, and, since he cannot recover from his master, he cannot recover at all. *Assuming the defect which caused the injury to have been discoverable by the exercise of proper care, some one ought in fairness to be held responsible for its existence, and it is a mere mockery of justice to absolve the master simply on the ground that he was justified in trusting to the skill and diligence of a person, who, if that skill and diligence were, as a matter of fact, not exercised, is not liable to the servant because there is no privity of contract between them.* The question as to what exent the employer had a right to rely upon the act of a manufacturer is, of course, immaterial where he was put upon inquiry as to the condition of the appliance which caused the injury. (Italics ours.)

In 26 Cyc. 1139, the author, in discussing this rule, uses the following language:

"Reasonable care in the matter of inspection requires a master to make such an examination and test as a reasonably prudent man would deem necessary under the same circumstances for the discovery of possible defects, and he is not required, unless put upon notice as to the probable existence of defects, to employ unusual or extraordinary tests, nor to adopt the latest and most approved methods of testing machinery or appliances. The reasonableness and sufficiency of an inspection, when made, is a question of fact for the jury."

Counsel for the company cites section 153 of 1 Labatt on Master and Servant as supporting their doctrine, and quote therefrom as follows:

"That right of the employer to rely upon the quality of articles so purchased involves the corollary that he is not under any obligation to subject the articles to a test as minute as can and ought to be applied by a manufacturer."

But a close examination of the above extract shows that, under the circumstances of the case at bar, there was testimony sufficient to put a reasonably prudent and careful man upon inquiry, such facts and circumstances as the different and peculiar color, consistency, and smell of the oil, which would indicate, at least, that it was not the black lubricating oil that had formerly been used, and indicating, also, that the same was a dangerous explosive, and inflammable oil, on account of its pe-

culiar smell, as noticed by the workmen at the time it was sent down into the mine. Further on, in section 161 of the same volume, is found the following extract:

"The character of the inspection which the master is bound to make is described by various epithets and phrases, all of which, as will be seen from a subjoined note, are essentially the logical equivalent of the proposition that the examination must be such as a person of ordinary prudence would have made under the circumstances. The question whether the examination to which the instrumentality which caused the injury is actually subjected before the accident was such as to satisfy the standard thus indicated is primarily one for the jury. This principle is not affected by the fact that the preponderance of the testimony, whether measured by the number of witnesses or the comparative credit which the court may think to be due to each, is in favor of one litigant. Whether or not the duty of a master with regard to proper inspection has been performed by the application of any given test is to be determined in considering whether that test will give indications as to the actual condition of the instrumentality in question. In the application of this principle, the courts have usually proceeded upon the theory that a merely visual or ocular inspection of the exterior condition does not satisfy the full measure of a master's obligation where the servant's safety depends upon the soundness of the material of which an instrumentality is composed."

In this case, nothing but the reputation of the dealer is offered by the company as a full duty to its employees in one of the most hazardous employments men engage in.

In *Richmond & D. R. R. Co. v. Elliott*, 149 U. S. 266, 13 Sup. Ct. 837, 37 L. Ed. 728, which was an action for damages by reason of a defect in an iron casting, and where no reasonable examination or inspection would have disclosed the same, and where the court relieved the master from responsibility because of the almost undiscoverable defect in the appliance, it was nevertheless said:

"With regard to the defect in the iron casting which seems to have been revealed by the explosion, it may be said that it is not necessarily the duty of a purchaser of machinery, whether simple or complicated, to tear it to pieces to see if there be not some latent defect. * * * We do not mean to say that it is

never the duty of a purchaser to make tests and examinations of his own, or that he can always and wholly rely upon the assumption that the manufacturer has fully and sufficiently tested. It may be, and doubtless often is, his duty when placing the machinery in actual use to subject it to *ordinary tests for determining its strength and efficiency.* Applying these rules, if the railroad company, after purchasing this engine, made such reasonable examination as was possible, without tearing the machinery to pieces, and subjected it fully to all the ordinary tests which are applied for determining the efficiency and strength of completed engines, and such examination and tests had disclosed no defect, it cannot in any action by one who is a stranger to the company be adjudged guilty of negligence because there was a latent defect, one which subsequently caused the destruction of the engine and injury to such party."

In *Morton v. Detroit, etc., Co.,* 81 Mich. 423, 46 N. W. 111, Mr. Justice Cahill, in discussing the duty of employers in this regard, says:

"The managers of railroad companies are engaged in conducting for profit a business which at the best is hazardous to human life. In providing sound tools and safe appliances for the use of their employees, their plain duty, to say nothing of the dictates of humanity, requires great vigilance; nor can they be heard to excuse themselves from taking all reasonable care on the ground that care involves labor or expense. They cannot be held responsible for hidden defects in tools or appliances if they have used reasonable care in procuring them, but they are not absolved from the duty of testing or of inspection because they have bought in the open market of reputable dealers, or employed competent workmen to construct them. *If any defect exists which a careful test or inspection would have discovered, the master must be held to have knowledge of such defect, and to be responsible for it."* (Italics ours.)

See, also, in support of this doctrine *Hoes v. Ocean S. S. Co.,* 56 App. Div. 259, 67 N. Y. Supp. 782; *San Antonio Edison Co. v. Dixon,* 17 Tex. Civ. App. 320, 42 S. W. 1009; *Anderson v. Fielding,* 92 Minn. 42, 99 N. W. 357, 104 Am. St. Rep. 665.

In *Mather v. Rillston,* 156 U. S. 391, 15 Sup. Ct. 464, 39 L. Ed. 470, the court, speaking of the degree of care required

in the use of such dangerous instrumentalities as powder and oil, from whatever source procured, said:

"Occupations, however important, which cannot be conducted without necessary danger to life, body or limb, should not be prosecuted at all without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger there must be used all appliances readily attainable, known to science, for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence. If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon."

In 4 Thompson on Negligence, sec. 3784, is the following statement in respect to the necessity of inspection:

"No other rule can be stated upon this subject than to say that it is the duty of the master to resort *to such tests as are practicable and are reasonable, having reference to the character* of the machine or appliance, and to the nature and extent of the danger to be avoided. It has been reasoned that the master is not required to resort to tests which are impracticable, unreasonable, or oppressive, or which would be incompatible with the proper furtherance of his business, and which are only required to insure absolute safety, which is tantamount to saying that the master does not stand liable as an insurer, but is liable only for the exercise of reasonable or ordinary care, which is, as in other cases, a care in proportion to the danger to be avoided. But, on the other hand, where the result of a breaking of the machinery or appliance would be a calamity to the servant, the law will not always excuse a mere visual inspection, but will leave it to the jury to say whether some sufficient test ought not to have been applied."   (Italics ours.)

And again in 4 Thompson on Negligence, sec. 3990, the identical claim, the excuse, of the defendant, is discussed in the following language:

"The 'reputable manufacturer' doctrine is not that a master is exonerated from liability for dangerous defects in machinery, tools, and appliances which he purchases from a reputable man-

ufacturer by reason of a manufacturer being reputable; but, fairly stated, it is that a master who buys machinery, tools, and appliances from a reputable maker, and who also uses reasonable care in inspecting and setting them up and in putting them into use or operation, is not liable to an employee for injuries resulting from the negligence of the maker in using improper materials or in doing the work in an improper manner. So stated, the doctrine is entirely consistent with the principle which assigns the duty of the master of exercising reasonable care in these particulars to that class of primary, absolute, and unassignable duties which the master cannot cast off. The fact that he purchases the machine, tool, or appliance from a reputable manufacturer does not excuse his own negligence in inspecting it, in testing it, and in setting it up, but is a circumstance entering into the general ingredient of evidence speaking on the question whether or not he has exercised reasonable care in the premises. The purchase of the machine, tool, or appliance from a reputable maker does not alone excuse him."

We are then lead to the inevitable conclusion that while, as an abstract proposition, the rule contended for by the company correctly states the law, yet its full statement, with all its limitations and restrictions and modifications, will not, standing alone, answer as an excuse for the company, or a defense to the charge of negligence as made by the plaintiff, unless the jury found from all the facts and circumstances of the whole case that the company throughout the entire transaction used such care and caution as was reasonable and prudent, having in view the nature and character of the instrumentality furnished and the hazards of the employment. And we believe that no harm was done the company in refusing to give instruction No. 3, requested by the company and refused by the court, for the reason that the subject-matter therein treated was fully, fairly, and correctly stated and covered by the court in its general charge to the jury, and that the instruction requested did not state the true rule fully and correctly. The general charge, and especially instructions numbered 7, 9, and 10, which we insert below, to our minds covers this phase of the case admirably, and protects alike, without undue emphasis on any point, the interests of the company and the plaintiff as well. In order that we may not be misunder-

stood, we quote literally the following instructions, given by the court in the general charge:

"Instruction No. 7.  You are instructed that the operator of a coal mine is not an insurer of the lives of the men employed by him or it.  The operator is required only to exercise ordinary care in providing the men working for him a safe place to work and with safe appliances with which to do the work, and by 'ordinary care' I mean such care as a reasonably prudent man would use in the conduct of his own business under like circumstances."

"Instruction No. 9.  You are instructed that the defendant, in order to be relieved from liability for injuries received by its employees from the use of defective materials, is not required to furnish the best materials known, or to subject such as he does supply to an analysis, to determine what hazard may be incurred in their use; but the defendant is only required to use ordinary care in the purchase of suitable materials for the purposes for which said materials are intended, and in the use of such materials to follow the ordinary usage of the business as conducted by prudent men.  You are further instructed that if a coal company purchase a lot of oil from a reputable manufacturer under a warranty that it is a noninflammable lubricating oil, and after a large portion of said oil has been used without an accident or explosion from becoming ignited, and then one barrel of such oil becomes ignited, and is found to be inflammable, then the jury may take into consideration all of such facts and circumstances in determining whether or not the defendant company was guilty of negligence in the use of said oil in its mine.

"Instruction No. 10.  The jury is instructed that it is the duty of a master to use reasonable care to see that appliances and materials furnished for use by its servants are reasonably safe and suitable appliances and materials for the use and purposes for which they are intended, and this includes the necessity of using the same degree of care in the matter of observation and inspection to discover the character of the appliances and materials so furnished.  And this reasonable care varies according to the danger to be avoided and according to the character of the appliance or material so furnished.  So in the matter of furnishing oil for the use of its servants in lubricating the cars down in the mine, in this case, the defendant company was bound to use reasonable care to inspect and ascertain what sort of oil was furnished, and to use the same care to furnish

a reasonably safe and suitable oil; and the jury are to deter-
mine what would be the reasonable care the company should
exercise in respect to the inspection and use of this oil, and
whether what was done by the company, if anything, in this
respect, was the exercise of the reasonable care a reasonably
prudent man would have exercised in such a case.  You are
also instructed, however, that, where a breach of this duty
has occurred, protection or excuse cannot be had by showing
only a contract or guaranty respecting the matter by some third
person.  A reliance upon such contract or guaranty does not
necessarily show the exercise of the degree of care required; but
it is for you to say whether, under the facts and circumstances
and considering the nature of the substance being furnished and
the danger incident to its use, if unsafe, other and further in-
spection should have been made before sending the oil down
into the mine."

To our minds, the learned trial judge, with a fairness and
exactness to be commended, covered the question of "reputable
manufacturer," care, etc., in these instructions, in such a man-
ner that the company has no reason to complain.  The charge is
not only comprehensive as to the issues involved, but is a cor-
rect and exceedingly fair statement of the law, and, in fact, is
more favorable to the contention of the company than the facts
warranted.

In this case it must be remembered that several negligent
acts of the defendant company were complained of, and it is
sufficient if the minds of the jurors are fairly directed to each
of the actionable grounds in a general way, and if a proper in-
struction has been made in respect to the degree of care, re-
quired for the master in his conduct, with respect to the working
place and appliance furnished his servants, such as we have
seen was given by the court in this case, it then remains for the
jury to determine whether the master was exercising the degree
of care as was required by law and as defined by the court in
its instructions.  The court in its closing instruction told the
jury that it was for them to say whether under all the facts
and circumstances of the whole case, and considering the nature
of the substance being furnished and the dangers incident to its

use, if unsafe, other and further inspection should have been made before sending the oil down into the mine.

Instruction No. 11, requested by the defendant, which deals with the subject of proximate cause, was properly refused by the court, for the reason that there was no question of proximate cause in this case. And this appears not only from the evidence, or rather from the lack of evidence, but also by the conduct of the company throughout the trial, and by admissions in their brief. Yet the fact remains and cannot be successfully disputed that even this phase of the case was properly covered by the instructions of the court. Neither was it necessary for the court to specifically instruct that the knowledge of the master of this defect in the oil was necessary, for it is the established rule of law that, where knowledge is essential to charge the master, negligent ignorance is equivalent to knowledge. Besides, section 36 of article 9 of the Constitution of the state of Oklahoma provides that a master is made liable for the negligent acts of all its servants; and under this provision of the Constitution, if one employee of a master negligently makes use of a dangerous instrumentality to the injury of another servant, the latter may recover from the master.

The further consideration of alleged errors, in view of the foregoing conclusions, is rendered unnecessary. Their consideration could in no wise affect the determination of this case. The question of deceased's contributory negligence cannot be urged, for that phase of the case was wholly waived by the company at the trial, and the rule is well established that, where there is not evidence tending to show contributory negligence, it is not error to refuse to give an instruction on the subject. It is also settled that it is not error to refuse to give instructions offered which in themselves correctly state a rule of law, if the court in its general charge has covered the points. In the case at bar we are unable, from a careful review of the entire record, to discover any error of such importance as would authorize or warrant an interference with the verdict of the jury and the judgment entered in this case.

The awful catastrophe, whereby 29 men lost their lives, in the manner detailed in this record, smothered in the darkness of the mine, like rates in a trap, without notice, and without a chance to escape, dependent for their protection and their lives on the exercise, on the part of the company, of such reasonable care and vigilance as prudent men under similar circumstances would give, but which was denied them by the company, does not call for a microscopic examination of the record for the discovery of technical errors, whereby a reversal might be had. The real, and in fact only, important question in this case, as stated above, was the negligence of the company in and about the matters and things complained of. The company submits that the purchase of the oil in open market from a reputable dealer is sufficient excuse; and, having shown that it did so purchase, it therefore demands exoneration. The trial court rightfully held that the question of negligence was one of fact to be determined by the jury under all the circumstances of the whole case, aided by proper instructions. As we have seen, no errors in the instructions have been pointed out of sufficient importance to warrant interference. The jury resolved the question against the company. There is ample evidence to sustain the verdict, and the judgment of the district court of Pittsburg county should therefore be affirmed.

By the Court: It is so ordered.