JOHN J. SHEA *vs.* ARTHUR J. WELLINGTON.

Essex.    January 25, 1895. — April 2, 1895.

Present: FIELD, C. J., HOLMES, KNOWLTON, MORTON, & BARKER, JJ.

*Personal Injuries — Master and Servant — Duty to inspect Appliance — Employers' Liability Act — Negligence.*

In an action for personal injuries occasioned to the plaintiff, while engaged in blasting in the defendant's quarry, by an explosion of dynamite in a drill-hole which he was loading, it appeared that the method of blasting was to insert in the hole a dynamite cartridge and an " exploder," which was made of a copper covering filled with fulminate of mercury and discharged by electricity ; that there

are several kinds of exploders in general use; that the kind used by the defend-
ant was as good as any made; that the manufacturer of them made from six
thousand to eight thousand a day, packed them in boxes containing fifty each,
and sold them in the open market ready for use; and that the making of ex-
ploders is a business in itself requiring skill, technical knowledge, and special
machinery and appliances, and they are never made by quarrymen. The
plaintiff testified that one of the exploders furnished him on the day of the
accident had a seam through which the mercury could be seen. The manufac-
turer of them testified, and his testimony was uncontradicted, that he never saw
one with a seam in it; that they were tested several times in the process of
manufacture; that, when completed, they were dipped in melted wax at a cer-
tain heat, which left a glazing of wax over the whole exploder; and that, if
there was a seam in an exploder when it was dipped in wax, it would explode.
The defendant's superintendent testified that he had used this kind of exploder
for years and never saw one with a seam in it, or one which exposed the mer-
cury. There was no evidence tending to show that up to the time of the
accident an exploder of this kind with a seam in it, or with any other defect of
construction, had ever been discovered by anybody. *Held*, that there was no
duty on the defendant's part to inspect the exploders as to their construction
before they were used.

An exploder made of a copper covering filled with fulminate of mercury and
discharged by electricity, which is bought by the owner of a quarry to be used
and instantly consumed in producing an explosion for the purpose of blasting
rock, is not a part of his "ways, works, or machinery," within St. 1887, c. 270,
§ 1, cl. 1.

An employer is not liable, under St. 1887, c. 270, § 1, cl. 2, for the negligence of
his superintendent in furnishing an employee with a defective appliance, if the
employer owes no duty to his employee to have the appliance inspected in
regard to its construction before use, and if it is no part of the superintendent's
business to make such inspection, unless he assumes so to do, with his employer's
knowledge and consent, as a part of the work which, as superintendent, he is
employed to do.

Tort, for personal injuries occasioned to the plaintiff, while
in the defendant's employ. The declaration contained three
counts, the first at common law, and the second and third under
the employers' liability act, St. 1887, c. 270, § 1, cls. 1, 2. Trial
in the Superior Court, before *Sherman*, J., who, at the defend-
ant's request, directed the jury to return a verdict for the defend-
ant; and the plaintiff alleged exceptions. The facts appear
in the opinion.

*W. H. Moody*, for the plaintiff.

*H. E. Bolles & C. A. Cushman*, for the defendant.

Knowlton, J. The plaintiff, while blasting in a quarry, was
injured by an explosion of dynamite in a drill-hole which he
was loading. The method of blasting was to insert in the hole
a dynamite cartridge, and an exploder which was discharged by

electricity. The exploders used were the kind known as the
Victor. They are thin copper plates or shells about one and
a half inches long, and one third of an inch in diameter.
These caps or shells are made or " swaged " by machinery out
of an entire piece of thin copper plate, and are pressed in a
die into the form of a seamless cap, closed at one end and open
at the other. The tube or cap is subsequently nearly filled with
fulminate of mercury. Into and through the open end run the
ends of two small wires several feet in length. These two wires
are connected within the exploder by a very fine platinum wire.
After the insertion of the wires the open end of the cap is filled
with a preparation of sulphur. The fulminate of mercury is
white or cream-white in color, and is very explosive. The object
of the exploder is to explode the dynamite. The exploder is
discharged by an electric current sent through the two wires.
There are several kinds of exploders in general use : some are
made to fire with a fuse ; some are not pressed or swaged out
of a single piece of copper in such a way as to be seamless, but
the copper is made into a tube formed by rolling and lapping
one edge over the other so as to make a joint the length of the
tube. There was evidence " that the manufacturers of the Vic-
tor exploder were the second largest manufacturers of exploders
in this country, and made six to eight thousand a day." The
Victor exploders are as good as any made, and the plaintiff did
not contend that the defendant was negligent in using this
kind of exploder. They are packed by the manufacturers in
boxes containing fifty exploders, and are thus sold in the open
market, ready for use. The defendant bought the Victor ex-
ploders in the open market, sold them to others, and used them
in his own quarry. The making of exploders is a business in
itself, requiring skill and technical knowledge, and special ma-
chinery and appliances. They are never made by quarrymen.
All the foregoing facts were not disputed.

The plaintiff testified that on the day of the accident he got
from the defendant's superintendent seven exploders to be used
in loading seven holes drilled in the ledge, and that the superin-
tendent, as he took them out of the box, passed each of them
from one hand to the other and looked at them, and " when
he came to the fourth or fifth he picked at it with his finger-

nail " and said, " I guess that is all right." The plaintiff also
testified that he saw there was a seam in the copper, perhaps
half an inch long lengthwise of the exploder, through which
he saw a white substance. The defendant's superintendent
denied that he got the exploders for the plaintiff, or saw them,
and testified that the plaintiff took the key and got them him-
self. There was no corroboration of the plaintiff's testimony in
this part of the case, but there was other evidence that, if there
was then a seam in the exploder through which the fulminate
of mercury could be seen, and if the plaintiff used it as he said
he did, it would adequately account for the accident. There
was testimony from other witnesses, who were uncontradicted
except by the plaintiff, tending to show that the accident was
caused by the plaintiff's using a hammer in pounding upon the
end of a stick or drill in the hole where the dynamite was.

If we assume that there was a seam in the exploder through
which a white substance could be seen, the first question is
whether there was evidence of negligence on the part of the
defendant in failing to have the exploders inspected after he
bought them and before they were used. It is conceded that
he did the best that could be done to procure exploders that
were safe, unless it was his duty to inspect them one by one
at the quarry in reference to their qualities and mode of con-
struction. The precise question now to be determined is whether
there was any evidence which would warrant the jury in find-
ing that the defendant ought to have made such an inspection.
It is obvious that an inspection could not effectively be made
unless a skilled expert was employed, possessed of the mechani-
cal and chemical knowledge involved in the manufacture of
them. Upon the admitted facts these articles are manufactured
with a view to rendering such inspection unnecessary. They
are composed of very dangerous chemicals. They are put up
in boxes to be sold in the market and to be used by quarrymen
as they are purchased. The persons into whose hands they are
intended to go when sold would not be competent to inspect
them. They are admitted to be the best of their kind. The
plaintiff, who had previously had six or seven years' experience
in quarrying, including blasting, testified that he " never saw
any trouble with any other exploder " than the one to which

he imputed his injury. The plaintiff called experts, some of whom had seen seams in exploders constructed with a seam, but no one of whom ever saw an exploder with a seam in it exposing the mercury, or ever saw an exploder of this kind of construction with any seam at all in it. These experts testified that they never looked for seams in exploders and never thought it necessary, and their uncontradicted testimony was that they used them just as they came. There was no evidence from anybody that a defect in one was ever discovered, unless there was a defect in one of those used on the day of the accident. If there was anything unusual in the appearance of the exploders, it would be almost certain to attract the attention of a person about to use it in loading a hole, and from his experience in blasting he would be more likely to know whether it was dangerous than a person employed as an inspector, unless that person was an expert in the manufacture of exploders.

The manufacturer testified, and there was no evidence tending to contradict his testimony, that for six years he had manufactured from six thousand to eight thousand of these exploders per day, and that he never saw one with a seam in it. He said that the exploders were tested several times in the process of manufacture, that when completed they were dipped in melted wax at a heat of 250° Fahrenheit, which leaves a glazing of wax over the whole exploder, and that if there was a seam in an exploder when it was dipped in wax it would explode. Watson, the defendant's superintendent, testified that he had used this kind of exploders for years, and never saw one with a seam in it, or one which exposed the mercury. There was no evidence in the case tending to show that up to the time of the accident an exploder of this kind with a seam in it, or with any other defect of construction, had ever been discovered by anybody. The uncontradicted testimony in regard to the mode of constructing them and preparing them for the market indicates that it would be almost impossible for an exploder with such a defect in it to be produced by the processes of construction used, and to pass repeated inspections and be put into the boxes and sent to the market. Judging the defendant's conduct by the facts which he knew or ought to have known before the accident, we find nothing to indicate that he

had any duty to inspect these exploders as to their construction before they were used. It would be unreasonable to hold upon these facts, or upon any evidence in this case when considered in connection with the admitted facts, that quarrymen using these exploders owed their employees a duty to have them inspected by a competent person as to the mode and workmanship of their construction.

The case is very different from *Moynihan* v. *Hills Co.* 146 Mass. 586, and others of that class. The general principles stated in that case, when applied to facts like these, do not call for an inspection by an employer to see whether there are defects like that testified to by the plaintiff. The defendant had every reason to believe that the exploders were manufactured in such a way as to be safe to use. In view of the confidence which he might properly place in the manufacturers of such an article, which had been produced in such quantities and had been so long and so well known in the market, the effort required to make an inspection of them in regard to their construction and condition at the quarry where they were used, or to cause one to be made, would have been much greater than it would be reasonable to require. They were not a part of the machinery or tools of the defendant. They were articles to be used in his business which were instantly consumed in use. It was his duty, so far as he could do it by reasonable effort, to see that none but safe and proper articles were furnished to his servants for such a use, but he was only called upon to do what was reasonable under the circumstances.

This case is somewhat analogous to *Garragan* v. *Fall River Iron Works*, 158 Mass. 596, in which it was held that an employer owes his employee no duty to inspect cotton bales on which an employee is working to see if the covering is strong enough safely to hold the hooks which are commonly used in moving such bales; but the analogy is not complete.

We are of opinion that the plaintiff cannot recover under the first count of his declaration, which alleges neglect of duty arising under the common law.

The second count alleges negligence of the defendant in regard to his ways, works, or machinery. Under this count there can be no recovery, because the exploder was not a part of the de-

fendant's ways, works, or machinery, within the meaning of the law, but was only an article of merchandise which was bought to be used and instantly consumed in producing an explosion. *Lynch* v. *Allyn*, 160 Mass. 248. *Burns* v. *Washburn*, 160 Mass. 457.

The third count alleges negligence of the defendant's superintendent in furnishing for the plaintiff's use a defective exploder. We have already seen that the defendant owed the plaintiff no duty to have the exploders inspected by his superintendent, or by anybody else, in regard to their construction. Unless there was evidence which would have warranted the jury in finding that inspecting the exploders for defects in construction was a part of the business of superintendence in which the superintendent was negligent, it is of no consequence in this case whether he did or did not act carelessly in picking with his nail at the exploder, and then passing it to the plaintiff to be used, as the plaintiff testifies he did. There is evidence that he was the general superintendent at the works. Doubtless the general custody of the exploders and of all the other property there was involved in his superintendence, but is there any evidence that an inspection of them for defects in construction was a part of the duty which, as a superintendent, he was hired to perform? The admitted facts and undisputed evidence to which we have already referred make it almost certain that he was never hired to do such a duty. In order to hold an employer for positive acts of negligence on the part of his superintendent, if these facts relate to a matter in regard to which the employer has no duty to perform, it should be made clearly to appear that the employer has undertaken to do by his superintendent that which he was not called upon to do. An act done voluntarily by the superintendent in that field, without the direction or approval of the employer, would not be an act of superintendence. *Fitzgerald* v. *Boston & Albany Railroad*, 156 Mass. 293. *Cashman* v. *Chase*, 156 Mass. 342. The superintendent testified that on the day of the accident the plaintiff went to the cupboard, " unlocked it with the key that always hung there, took what exploders he wanted as usual, and returned to the ledge." Speaking of the exploders, he also testified that " Shea never brought them to him for inspection." The plaintiff testified that on the day of the accident the superintendent took the

seven exploders, passed each from one hand to the other, and looked at them. He also testified, in direct examination, that when he got the exploders from the cupboard himself, he always showed them to Watson before using them, and he inspected them. But in cross-examination he testified that he never took the dynamite to Watson for inspection. He also said, "Sometimes Mr. Watson would get the exploders, but most of the time I would get the key from him and go to the engine-house, unlock the cupboard, and take the exploders from the box myself. I took them up as they came, — never selected them. . . . I never saw any trouble with any other exploder." Although there is language in the plaintiff's direct examination indicating that Watson was accustomed to look at the exploders, there is very little even in that to indicate that he was inspecting them in regard to their construction, or doing more than to look to see how many were used. But the effect of this is almost, if not entirely, taken away by the plaintiff's later testimony in cross-examination, which fairly implies that he was accustomed to get the key and take these exploders, and use them without inspection. Taking the testimony together, there is hardly more than a scintilla of evidence that Watson ever assumed to inspect these exploders to see whether they were safely and properly made. But if Watson assumed to do that, it being no part of the defendant's business to do it or to have it done, it cannot affect the defendant unless it appears that it was done with the defendant's knowledge and consent, as a part of the work which, as superintendent, he was employed to do. There was no testimony that the defendant ever hired him to do it, or knew that he assumed to do it. If he saw the seam in the exploder, and if the jury might have found that as a prudent man he ought to have thought the exploder unfit for use by reason of the seam, his negligence in failing to say so to the plaintiff was only the negligence of a fellow servant, for which the defendant is not liable. There is no evidence that the determination of the question whether an exploder was unsafe by reason of an apparent defect in construction was within the scope of his employment as superintendent. He was not selected in reference to his qualifications to decide such a question. If he noticed a seeming defect in the mode of construction of an article which

he was not expected to examine, and whose workmanship was outside of the field of his superintendence, his duty to speak of it to the plaintiff was no greater than that of any other workman of equal knowledge and experience who might have seen it. If he was guilty of negligence in that particular, his negligence was that of an ordinary employee, and not that of a superintendent. We are of opinion that the jury would not have been warranted in finding that the plaintiff suffered from any negligent act on the part of Watson done in that part of the work in which he was employed to exercise superintendence.

If there was a mere scintilla of evidence in favor of the plaintiff on this point, it was not enough to warrant the jury in finding a verdict for him. *Hillyer* v. *Dickinson*, 154 Mass. 502.

*Exceptions overruled.*