[No. 10455.   Department One.   December 18, 1912.]

ALASKA STEAMSHIP COMPANY, *Appellant*, v. PACIFIC COAST
GYPSUM COMPANY, *Respondent.*[1]

INDEMNITY—CONTRACT TO FURNISH APPLIANCES—DEFECTIVE APPLI-
ANCES—DAMAGES PAID.  Where a transportation company was com-
pelled to compensate employees injured by reason of a defective
hoisting appliance belonging to a shipper and which the shipper
had supplied under a contract with the transportation company to
furnish the same, the transportation company may recover over
from the shipper for the sums paid out, if it received and used the
appliances without notice of the defect.

SAME—ACTION AGAINST INDEMNITOR—EVIDENCE—QUESTION FOR
JURY.  In such a case, whether the transportation company had
notice of the defect, or acquiesced in the use of the defective appli-
ance, is for the jury, where it appears that it made use of the
same only at intervals of two to six weeks apart, that some weeks
previous it had notice of a worn and defective condition of a
tripping device which caused danger by premature dumping, but on
the morning in question it had been used several hours without
accident and it was at all times in the possession and control of
the shipper.

Appeal from a judgment of the superior court for Pierce
county, Clifford, J., entered November 13, 1911, upon grant-
ing a nonsuit, dismissing an action for contribution.  Re-
versed.

*Bogle, Graves, Merritt & Bogle* and *Huffer, Hayden &
Hamilton,* for appellant.

*John P. Hartman* and *Hayden & Langhorne,* for respond-
ent.

PARKER, J.—The Alaska Steamship Company brought
this action in the superior court for Pierce county, to re-
cover over the sums it was required to pay in settlement of
damages for personal injuries resulting to two longshore-
men, its employees, from a defective hoisting appliance be-

[1]Reported in 128 Pac. 654.

longing to the defendant and used in unloading gypsum rock from one of the plaintiff's ships at the defendant's wharf and plant in Tacoma. The cause proceeded to trial before the court and a jury, when at the close of the evidence introduced in behalf of plaintiff, counsel for the defendant moved the court as follows:

"The defendant moves the court to grant a nonsuit in this case upon the ground and for the reason that the plaintiff has failed to make a case sufficient to submit for the consideration of the jury.

"The particular ground of the motion is that, under the evidence in this case, both the Alaska Steamship Company and the Pacific Coast Gypsum Company were joint wrongdoers, and as between joint wrongdoers no right of contribution exists.

"That the evidence plainly shows that the Alaska Steamship Company had notice of the condition the hook was in, and that if they did not have actual notice, a reasonably careful inspection would have disclosed the condition of the hook, and that the Alaska Steamship Company could not, knowing the hook was in a defective condition, use it to the injury of their men and then attempt to subject the Pacific Coast Gypsum Company to a suit for damages."

We quote this motion in full, to the end that the theory of counsel's contention may be clearly before us. This motion was granted by the court, and judgment entered accordingly. From this disposition of the cause, the plaintiff has appealed.

Appellant is a corporation engaged in the transportation business between Puget Sound and Alaska ports. Respondent is a corporation engaged in the business of manufacturing gypsum, and for that purpose maintains a plant and wharf in Tacoma, procuring gypsum rock therefor from its mine in Alaska. At its wharf in Tacoma, respondent maintains hoisting gear, consisting of a derrick with cables, buckets equipped with tripping appliance, and an electric motor for operating the same, which it uses in discharging

cargo from the holds of ships. On April 5, 1909, appellant entered into a contract with respondent for the transportation of gypsum rock from its mine in Alaska to its wharf in Tacoma. This contract is in the form of a letter from appellant to the respondent, and an acceptance of the terms thereof, indorsed thereon by respondent. The provisions of this contract which we are here required to notice are as follows:

"It being understood and agreed, in connection with delivery of cargo at Tacoma that you will from date this agreement goes into effect, furnish necessary hoisting gear to work cargo from one hatch of steamer, . . . and take cargo from us as fast as we can deliver it. It is also understood and agreed, in connection with delivery of cargo at Tacoma, that 'taking cargo from us as fast as we can deliver it' means as fast as we can shovel into buckets in hatches from which you are hoisting cargo with your gear."

Appellant proceeded under this contract to transport gypsum rock, its ships arriving at respondent's wharf in Tacoma at somewhat irregular times, which were from two to six weeks apart. The ships were discharged in the manner agreed upon, respondent's hoisting gear, buckets, tripping appliance, and electric motor being used therefor and operated entirely by respondent's own servants, excepting that the buckets were filled while in the hold of the ship and the hook on the end of the hoisting cable attached to the buckets by the appellant's employees just before hoisting the buckets out of the hold. The hoisting gear was at all times in the possession and control of respondent, it being the owner thereof, during the intervals occurring between the discharging of appellant's ships, and even while the ships were being discharged appellant had nothing to do with the hoisting gear save to fill the buckets and attach the hook to them for hoisting.

On February 28, 1910, appellant's steamship Olympia was being discharged of a shipment of gypsum rock at re-

spondent's wharf. While one of the buckets was being
hoisted, filled with gypsum rock, it was prematurely dumped
on account of the worn and defective condition of the trip-
ping appliance attached to the hook, and the rock thereby
caused to fall back into the hold of the ship, upon and seri-
ously injuring two of appellant's employees who were there
engaged in filling the buckets. Appellant was required to
compensate these employees on account of the injuries thus
suffered by them. While appellant compensated its injured
employees without judgment being rendered against it there-
for, no question is here made as to its liability to them, nor
as to the amount thereof. It is to recover from respondent
the sums so paid by appellant to its injured employees that
this action was brought.

Counsel for respondent rest their claim of exemption from
liability to appellant upon the general rule that there is no
right of contribution between joint tort feasors; while coun-
sel for appellant insist that the evidence introduced in its
behalf upon the trial was sufficient to require submission to
the jury of the question whether appellant was a joint
wrongdoer with respondent as between themselves, though
they were admittedly such in so far as the rights of appel-
lant's injured employees are concerned. These were the only
questions involved in respondent's motion for nonsuit and
the trial court's decision thereon, and our present field of
inquiry is not extended by the contentions here made.

The general rule of nonliability for contribution and in-
demnity as between joint wrongdoers is easy of statement,
and rests upon the soundest principles of public policy. But
the exception to this general rule, or rather the question of
when the joint wrongdoers are not jointly in the wrong as
between themselves, yet are such in the eyes of the law as
to third parties, is often a problem of difficult solution. In
1 Cooley on Torts (3d ed.), p. 254, that learned author ob-
serves:

"As under the rules already laid down the party wronged may, at his election, compel any one of the parties chargeable with the act, or any number less than the whole, to compensate him for the injury, it becomes a consideration of the highest importance to the person or persons thus singled out and compelled to bear the loss, whether the others who were equally liable may be compelled to contribute for his relief. On this subject there is a general rule, and there are also some very important exceptions. The general rule may be found expressed in the maxim that no man can make his own misconduct the ground for an action in his own favor. If he suffers because of his own wrongdoing, the law will not relieve him. The law cannot recognize equities as springing from a wrong in favor of one concerned in committing it.

"But there are some exceptions to the general rule which rest upon reasons at least as forcible as those which support the rule itself. They are of cases where, although the law holds all the parties liable as wrongdoers to the injured party, yet as between themselves some of them may not be wrongdoers at all, and their equity to require the others to respond for all the damages may be complete. There are many such cases where the wrongs are unintentional, or where the party, by reason of some relation, is made chargeable with the conduct of others."

And at page 258, referring to the attempted general statements of the rule of the exceptions, he further observes:

"An attempt has been made in some cases to lay down a general rule by which it may be determined in every case whether the party is or is not entitled to contribution. Thus, in Ohio, the judicial conclusion is, that 'the common sense rule and the legal rule are the same, namely, that when parties think they are doing a legal and proper act, contribution will be had; but when the parties are conscious of doing a wrong, courts will not interfere.'

"This statement is a little inaccurate, in that it denies redress in the cases only in which parties are conscious of wrongdoing. There are many cases in which the absence of consciousness of wrong could not excuse a man either in law or morals. An English case states the rule more concisely as follows: 'The rule that the wrongdoers cannot have redress or contribution against each other is confined to cases

where the person seeking redress must be presumed to have known that he was doing an unlawful act.' If he knew the act was illegal, or if the circumstances were such as to render ignorance of the illegality inexcusable, then he will be left by the law where his wrongful action has placed him."

In *Washington Gaslight Co. v. District of Columbia,* 161 U. S. 316, 327, Justice White, speaking for the court, quoted approvingly from *Lowell v. Boston & Lowell R. Co.,* 23 Pick. 24, 32, 34 Am. Dec. 33, as follows:

"Our law, however, does not in every case disallow an action, by one wrongdoer against another, to recover damages incurred in consequence of their joint offence. The rule is, *in pari delicto potoir est conditio defendentis.* If the parties are not equally criminal, the principal delinquent may be held responsible to his co-delinquent for damages incurred by their joint offence. In respect to offences, in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But where the offence is merely *malum prohibitum,* and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers."

These general statements of the law suggest that we first determine the respective duties owing by each of the parties to the other under the contract, relative to the safety of the hoisting appliance furnished and used in discharging the gypsum rock from the hold of appellant's steamship Olympia. It is elementary law that appellant was obligated to furnish its employees a reasonably safe place in which to work; and that respondent was obligated under its contract with appellant to furnish the hoisting appliance in such condition of repair that it would not, while in operation, render the working place of appellant's employees other than reasonably safe, seems to us quite clear; especially in view of the fact that the respondent had entire charge and control of such appliance, excepting only the control which appellant's employees had over the buckets while filling them in the hold

of the ship, and over the hook while attaching it to the buckets for hoisting them therefrom.

Counsel for respondent seem to proceed upon the theory that appellant and respondent were under equal obligation to refrain from using, or permitting the use of, the hoisting appliance while in a defective and dangerous condition. That such was the extent of their duties in so far as the rights of appellant's employees are concerned, we think must be conceded. But the measure of appellant's and respondent's duties to each other in this respect under their contract is quite a different question. The terms of the contract, it seems to us, plainly imply that the hoisting appliance was to be furnished by respondent in such condition and state of repair as to render its use in the manner contemplated reasonably safe to appellant's employees while filling the buckets in the hold of the ship. This would make the primary duty of seeing to the safety of the appliance rest upon respondent, especially in view of the fact that respondent retained practically the entire control over the appliance, as we have noticed. It is, however, contended by counsel for respondent that "appellant was not relying upon any implied warranty that the hoisting gear was fit and proper for the use intended, because they had actual notice that it was not;" and this, it is argued, rendered appellant equally in the wrong with respondent and thus destroyed its right of contribution. The remarks made by the learned trial court in disposing of respondent's motion for nonsuit clearly indicate that this was the theory upon which it granted that motion. So the principal error committed by the trial court, if it was error, was in deciding, as a matter of law, that the evidence conclusively showed that appellant did have knowledge of the defective condition of the tripping appliance at the time of the accident, and that it was then knowingly acquiescing in its use. This, of course, was a question of fact; and unless the evidence was so conclusive thereon as to lead the minds of all reasonable men to the same conclu-

sion, it could not be decided as a matter of law, but should have been left to the jury. Let us inquire, then, what facts appear from the evidence bearing upon the question of appellant's knowledge of the defective condition of the tripping appliance at the time of the accident.

We have noticed the limited extent of the control over the appliance by the employees of appellant, and that only while it was in use during the discharge of the ships, and that these short periods of its use were separated by intervals of from two to six weeks, during which the appliance was in the exclusive control of respondent. At the time of the discharge of appellant's ship, which arrived some weeks previous to the date of the accident, the tripping appliance had, by reason of its worn and defective condition, caused the tubs to be prematurely dumped a few times, thus disclosing the danger attending the use of the defective tripping appliance at that time. This was then known to appellant's employees, and also to its foreman there in charge of its employees. At that time respondent's foreman there in charge had his attention particularly directed to the defective and dangerous condition of the tripping appliance, by appellant's employees who had seen the premature discharge of the tubs. The tripping appliance does not appear to have been inherently defective, but was defective by reason of the worn condition of certain of its parts; and while the evidence indicates that the defect could have been discovered by a close inspection of the particular worn parts, the principal fact evidencing its defect and dangers was the premature dumping of the tubs, and if the premature dumping of the tubs had not occurred, it is highly probable that no one would have discovered or thought of the defect. It appears that the tubs had prematurely dumped from this same cause on some previous occasions, but the evidence is somewhat obscure as to the particulars of those incidents.

The discharging of appellant's ship Olympia was commenced at about 7:30 o'clock on the morning of February

28, 1910, and proceeded continuously in the usual manner until 11 o'clock of that day, when one of the tubs was prematurely dumped because of this defective condition of the tripping appliance while being hoisted from the hold, resulting in the injury to appellant's employees. Nothing occurred during the three and one-half hours in which the appliance was continuously in use that morning indicating its dangerous condition, though it is true that it was then in the same condition as on the previous occasions when the tubs had prematurely dumped. Appellant's foreman did not see the hook or tripping appliance that morning, except possibly at a distance, and had not seen it since the discharge of the ship which was there some weeks previous. The argument of counsel for respondent, as well as the views of the trial court in granting the nonsuit, evidently rests upon the assumption that the knowledge of the defective and dangerous condition of the tripping appliance, existing on the previous occasions of the discharge of appellant's ships, points with such certainty to the existence of such knowledge and acquiescence in the use of the defective appliance at the time of this accident that the question may be decided in respondent's favor as a matter of law. That such previous knowledge on the part of appellant, and the circumstances, are somewhat persuasive in favor of the trial court's conclusions of fact, may be conceded; but that such knowledge is such conclusive proof of like knowledge at the time of this accident that all reasonable men must arrive at that conclusion, we cannot agree. We therefore conclude that the question could not be decided as a matter of law, but should have been left to the jury.

In the case of *Mowbray v. Merryweather*, 65 L. J. Q. B. 50, 2 Q. B. 640 (1895), we find the parties situated similarly to those in this case. There the plaintiffs were stevedores and the defendant the owner of a ship. The plaintiffs contracted to discharge a cargo from the ship, and the defendant undertook to provide necessary and proper derricks, chains, and

other gear reasonably fit for that purpose. He failed to do so, in that he supplied a defective chain, which while being used in discharging the cargo, broke, thereby injuring one of the plaintiffs' employees. The plaintiffs, being compelled to compensate their employee, sought to recover over from the defendant in an action for breach of his contract. It was admitted by the plaintiffs that they might, by the exercise of reasonable care, have discovered the defect in the chain. Referring to the respective duties owing by these joint wrongdoers to each other and to the injured employee, Lord Esher, speaking for the court, said:

"The plaintiffs owed no duty to the defendant to examine the chain before allowing it to be used by their workmen. The only duty they owed in that respect was to the workmen."

The question of what right the plaintiffs might have to contribution in that case, had they actually known of the defective condition of the chain and acquiesced in its use while in such condition, was not involved. The case was decided apparently upon the theory that they did not know, and were not bound to discover the defect. Recovery by the plaintiffs was there sustained. In *Boston Woven Hose & Rubber Co. v. Kendall*, 178 Mass. 232, 59 N. E. 657, 86 Am. St. 478, 51 L. R. A. 781, there was involved the right of the plaintiff to recover over from the defendants, who were boiler makers and had undertaken to make for the plaintiff a boiler which would stand a certain working pressure, but which upon being put to use by the plaintiff did not stand the pressure and exploded, causing injuries to third persons. Justice Holmes, now of the United States Supreme Court, speaking for the court in that case, said:

"We are fully aware of the difficulties in the way of holding a person liable for damage when the tort of another has intervened between his act and the result complained of. *Glynn v. Central Railroad*, 175 Mass. 510, 511, 56 N. E. 698, and cases cited. Nevertheless it is held by our decisions that in some cases of that sort there may be a recovery, and

this seems to be recognized in the case upon which the defend-
ants chiefly rely. *Nashua Iron & Steel Co. v. Worcester &
Nashua Railroad*, 62 N. H. 159. The defendants, to bring
themselves within the distinctions there taken, insist that we
must assume that the plaintiff here might have prevented the
accident by ordinary care, because it must have been held
liable on the ground of a want of such care, and that, in such
a case at least, it cannot make the defendants indemnify it.

"We are of opinion that the plaintiff is entitled to hold its
verdict, and that if indemnity ever is to be recovered, short of
an express contract of insurance, for what is in form the
result of a tort on the plaintiff's part, this case belongs to
the class in which it should be allowed. The plaintiff's mis-
conduct consisted in a failure to discover by inspection a de-
fect in an article specially made for it and probably not falling
within the exceptional rule as to well known articles made by
reputable makers and sold in the market ready for use. *Shea
v. Wellington*, 163 Mass. 364, 369, 40 N. E. 173. Such a
failure might make the plaintiff answerable to its men, but
even if its conduct be called want of ordinary care, it was in-
duced, as we must assume after the verdict, by the warranty
of representations of the defendants. The very purpose of
the warranty was that the boiler should be used in the plain-
tiff's works with reliance upon the defendants' judgment in a
matter as to which the defendants were experts and the plain-
tiff presumably was not. Whether the false warranty be
called a tort or a breach of contract the consequences which
ensued must be taken to have been contemplated and was not
too remote.

"The fact that the reliance was not justified as toward the
men does not do away with the fact that the defendants in-
vited it with notice of what might be the consequences if it
should be misplaced, and there is no policy of the law opposed
to their being held to make their representations good."

Among other cases arising out of contractual relations be-
tween the joint wrongdoers are: *Brooklyn v. Brooklyn City
R. Co.*, 47 N. Y. 475, 7 Am. Rep. 469, and *Oceanic Steam
Nav. Co. v. Compania Transatlantic Espanola*, 134 N. Y.
461, 31 N. E. 987, 30 Am. St. 685. In the latter case, after
reviewing numerous decisions, Chief Justice Follett, speaking
for the court, observed:

"Sufficient cases have been cited to show that one who has been held legally liable for the personal neglect of another is entitled to indemnity from the latter, no matter whether contractual relations existed between them or not, and that the right to indemnity does not depend upon the fact that the defendant owed the plaintiff a special or particular legal duty not to be negligent. The right to indemnity stands upon the principle that every one is responsible for the consequences of his own negligence, and if another person has been compelled (by the judgment of a court having jurisdiction) to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him."

The following cases involving duties of joint wrongdoers as between themselves arising otherwise than by contract are in point: *Minneapolis Mill Co. v. Wheeler*, 31 Minn. 121, 16 N. W. 698; *Old Colony R. Co. v. Salvens*, 148 Mass. 363, 19 N. E. 372; *Gray v. Boston Gas Light Co.*, 114 Mass. 149, 19 Am. Rep. 324; *Chicago & N. W. R. Co. v. Dunn*, 59 Iowa 619, 13 N. W. 722; *Washington Gas Light Co. v. District of Columbia*, 161 U. S. 316; *Town of Waterbury v. Waterbury Traction Co.*, 74 Conn. 152, 50 Atl. 3.

The case last cited involved a claim of the town against the traction company because of the act of the traction company in removing a railing from the side of a street, which was there for the protection of the traveling public, and failing to replace it after the purpose of the removal had been accomplished. In holding that the town had the right of contribution after being compelled to pay damages caused by the act of the traction company, the court said:

"As between it and the public it was undoubtedly the duty of the town in such case to properly protect travelers against the danger which the traction company had created, and by its failure to do so it became liable in damages to Ashborn. But the primary cause of the accident was the act and fault of the defendant in taking down the railing and failing to restore it, assuming that the defendant took it down as alleged. As between the plaintiff and defendant, there was no co-operation in the act of negligence which caused the injury.

The plaintiff did not permit the defendant to leave the railing down. If the defendant took it down, it promised impliedly, if not expressly, to do so in a way not to endanger public travel, and to put it up again. If it failed to keep that promise, it cannot justly charge the plaintiff with negligence either in having relied upon such promise or in having failed to compel its performance. If the defendant removed the railing, and left it down, as alleged, the fact that the plaintiff had knowledge of the defect, and neglected to repair it, although it had a fair opportunity to do so, will not prevent a recovery in this action. *Town of Hamden v. New Haven & N. Co.*, 27 Conn. 158-167; *Norwich v. Breed,* 30 Conn. 538, 545; *Holyoke v. Hadly Water-Power Co.,* 174 Mass. 424, 54 N. E. 889; *Brookville Borough v. Arthurs,* 152 Pa. St. 334, 25 Atl. 551; *Chicago City v. Robbins,* 2 Black 418, 425."

We would not go to the extent of holding in the case before us that appellant would be entirely absolved from blame, to the extent that it could have contribution from respondent regardless of its knowledge and acquiescence in the use of the defective tripping appliance, in view of the particular relations of the parties in this case, though the logic of the decisions last above quoted viewed superficially might lead to such a conclusion. It might not be wholly out of place to view the duty of appellant to respondent here somewhat as if there were involved a question of contributory negligence or assumption of risk on the part of appellant. Indeed, that would become the question if appellant were an individual and had been personally filling the tubs and been injured, as its employees were. This, however, would in any event present a question for the jury, because we could not say, under such circumstances as are here shown, that reasonable men might not differ in their conclusions as to appellant's assumption of risk or contributory negligence, were it an individual and itself injured by respondent's defective tripping appliance.

Counsel for respondent rest their contention that the appellant and respondent were joint wrongdoers as between themselves largely upon our holding in *Tacoma v. Bonnell,*

65 Wash. 505, 118 Pac. 642, 36 L. R. A. (N. S.) 582. We think, however, that the facts there involved show that the city, which was there seeking contribution, was at least equally in the wrong with the defendant in violating a positive duty, if indeed not in the wrong in a greater degree, in causing the injury which it was required to compensate for. Nor were there any contractual relations existing between the city and Bonnell which placed either of them under any special obligation to the other. The situation there involved is well summarized in the words of Justice Mount, used on page 510, as follows:

"We have, therefore, a case where the city was engaged in handling a dangerous agency, where it had notice of the dangerous character of the wires carrying such agency and of the methods ordinarily used to prevent danger, and had failed to remedy the dangerous condition. Thereupon the defendant negligently or carelessly permitted or caused the dangerous wires to come in contact, and injury resulted to a third person."

We think that decision is not controlling here. Other cases relied upon by counsel for respondent are: *Atlanta Consol. St. R. Co. v. Southern Bell Tel. & Tel. Co.*, 107 Fed. 874; *Union Stock Yards Co. v. Chicago, B. & Q. R. Co.*, 196 U. S. 217; *Consolidated Kansas City Smelting & Refining Co. v. Binkley*, 45 Tex. Civ. App. 100, 99 S. W. 181; *Galveston, H. & S. A. R. Co. v. Nass*, 94 Tex. 255, 59 S. W. 870. In the *Atlanta Consol. St. R. Co.* case, the plaintiff, widow of the deceased who lost his life, passed over the company who owed the particular obligation to her husband, its employee, and sued the company she claimed was guilty of the real negligence which caused his death; and having recovered, that company sought contribution from the other company, the deceased husband's employer. It is apparent, therefore, that the situation was there exactly the reverse from what it is in this case. In disposing of claimed right of contribution, the court said:

"A recovery could not have been had by Mrs. Owings against the Consolidated Company unless it was guilty of such real, actual negligence as would prevent, under the authorities, a recovery against one guilty also of wrong in the same transaction."

In that case the company which was passively guilty of the wrong was not sued by the original claimant, but the company was sued which could be held only because of its active wrong. The plaintiff, of course, could not have contribution. In the *Union Stock Yards and Smelting Company* cases, a critical examination of the facts will show that neither wrong-doer owed to any other any special duty which was violated. The decision in the *Galveston Railway* case, it must be admitted, is not so easily distinguishable in principle, in view of the fact that the company from which contribution was sought was the owner of the defective car furnished to the other company, which defect resulted in the injury for which that company was compelled to compensate. If, however, that decision is out of harmony with the views we have here expressed, we will have to be content with declining to follow it.

We are of the opinion that it cannot be decided, as a matter of law, in the light of the evidence, that appellant had knowledge of the defective and dangerous condition of the tripping appliance on the day of the accident, nor that it then knowingly acquiesced in the use of such dangerous appliance, nor that such knowledge and acquiescence could, as a matter of law, be attributed to appellant. We conclude that, at the close of plaintiff's evidence, the proof was in such condition that the case should have been submitted to the jury with appropriate instructions not inconsistent with the views we have here expressed.

The judgment is reversed, and appellant granted a new trial.

MOUNT, C. J., CHADWICK, CROW, and GOSE, JJ., concur.