BETHLEHEM SHIPBUILDING CORPORATION, Limited, v. JOSEPH GUTRADT CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1926. Rehearing Denied March 22, 1926.)

No. 4684.

1. Shipping ⬅121(1)—Duty to make ship seaworthy nondelegable.

Duty of making ship seaworthy is nondelegable, and steamship company cannot successfully defend libel by shipper for damage to cargo on ground that shipbuilding corporation had not properly performed its contract to repair.

2. Indemnity ⬅13(1)—Shipbuilding corporation, failing to properly perform contract to repair vessel, held liable to shipowner for recovery against it for damage to cargo.

Shipbuilding corporation, failing to properly perform contract to repair and overhaul clapper valves, held liable to shipowner for amount which it was required in shipper's libel to pay for damage to cargo on account of defective clapper valve.

3. Indemnity ⬅15(4)—Shipowner not required to inspect all clapper valves, some of which were covered with cargo, because of constructive notice from finding one valve defective.

As respects liability of shipbuilding corporation to steamship company for amount recovered from steamship company by shipper for damages to cargo, because of defective clapper valves repaired by shipbuilding company, shipbuilding company could not defend on ground that steamship company was negligent in not inspecting all the valves, when one was discovered by the steamship company's engineer to be defective, and was repaired by him, where at the time of such discovery the engineer inspected all the valves which were not covered with cargo and found them sound, and the damage in question was caused by valves which could not then be inspected, because covered with cargo.

Appeal from the District Court of the United States for the Southern Division of

the Northern District of California; Frank H. Kerrigan, Judge.

Libel by the Joseph Gutradt Company against the Pacific Mail Steamship Company, which impleaded the Bethlehem Shipbuilding Corporation, Limited, and prayed for judgment over against it. From a decree for plaintiff against the Pacific Mail Steamship Company, with judgment over against it, the Bethlehem Shipbuilding Corporation, Limited, appeals. Affirmed.

Wilson & Wilson, Chas. H. Lovell, and Ira S. Lillick, all of San Francisco, Cal., for appellant.

Farnham P. Griffiths, Joseph B. McKeon, Douglas D. Crystal, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellee Pacific Mail S. S. Co.

Before HUNT, RUDKIN, and McCAMANT, Circuit Judges.

HUNT, Circuit Judge. This was a libel filed by Joseph Gutradt Company, appellee here, against the Pacific Mail Steamship Company, for damages to cargo. The Bethlehem Shipbuilding Corporation, appellant, was the third party respondent, having been impleaded by the Pacific Mail Company, which prayed for judgment over on the ground that the cause of the damage to the cargo was the Bethlehem Corporation's breach of a contract to repair the ship Ecuador. The decree was in favor of the Gutradt Company, libelant, against the Pacific Mail Company, with judgment over against the Bethlehem Corporation, and the Bethlehem Corporation appealed.

The Pacific Mail Steamship Company contracted with the Bethlehem Shipbuilding Corporation to repair the steamship Ecuador, belonging to the steamship company, and among other matters "(4) overhaul all clapper valves on ship's sides, renewing all missing or broken pins and clapper valves (about 30 valves). * * * All work to be finished and vessel alongside pier 44, or any other pier designated by owner, and ready to load cargo by 6 a. m. October 11, 1923." The vessel was delivered to the Bethlehem Corporation for the repairs, and was redelivered to the Pacific Mail Company on Thursday morning, October 11, 1923.

On the 13th of the month the Pacific Mail Company made a contract of affreightment with the Gutradt Company, by which Pacific Mail Company acknowledged receipt of 1,-334 cases of salt water soap in apparent good order and condition, and agreed to transport the soap to Norfolk, Va., and there to deliver it in like apparent good order and condition.

After redelivery the ship was fumigated and released in the afternoon of October 11th. The chief officer went through the cargo holds to see that the floor boards and cargo battens were in place, but made no examination of the clapper valves, because those appliances fell within the jurisdiction of the engineer. There were five holds in the ship. In No. 2 hold, to which this suit has special relation, there were three clapper valves, two on the left side and one on the right. A clapper valve is sufficiently described as a nonreturn valve in the hold, and has the function of letting the drain water out and not allowing sea water to come in. The device has a bonnet or cover, which must be properly placed for the successful operation of the valve; otherwise, sea water will enter the hold.

After fumigation the stevedores began stowing the cargo in No. 2 hold between-decks, and on the following day, while stowing from aft forward, a stevedore noticed that the forward port clapper valve of the 'tween-decks was uncovered. He reported the matter, and upon examination the chief engineer discovered that the cover was not in place, but was lying with the bolts on a cargo batten. His testimony is that he bolted it back in its place. At that time the after part of the 'tween-decks of that hold was loaded up to the deck and out in the wings. The engineer crawled over the cargo to see if other valves were intact or not, but he found them covered with cargo. He then went into other holds, where he found all valves, not covered, in sound condition. Loading was finished on the night of Saturday, October 13th, and the ship sailed for New York.

On Sunday evening, about 10 o'clock, soundings revealed 35 inches of water in No. 2 hold. Pumping was resorted to. At midnight soundings showed 25 inches of water; at 2 a. m. Monday there were about 25 inches; at 6 o'clock Monday morning a sounding showed 20 feet of water in No. 2 hold. The ship put in at Wilmington, Cal., where, after discharging cargo in holds 2 and 3, it was found that the water was rushing into No. 2 hold; the bonnet was off the starboard clapper valve, and the clapper and bonnet of the aft clapper valve on the port side were in reverse position, some of the bolts lying on a stringer. The valve that had been repaired by the engineer before leav-

ing San Francisco was found in water-tight condition. It appeared that the starboard valve, through which the water rushed, was beneath the water line. After repairs the ship resumed her voyage.

The cargo which had been stowed in holds 2 and 3 was damaged, and this suit was instituted on the theory that the failure of the Bethlehem Corporation to fasten securely the clapper valves and to overhaul the valves generally caused a breach of the contract of the Pacific Mail with the Gutradt Company to deliver the cargo in good order and condition; hence that the Bethlehem Corporation is liable to the Pacific Mail for the damage for which the Pacific Mail Company is liable to the Gutradt Company for breach of its contract of affreightment.

It is clear to us that, when the ship was redelivered to the Pacific Mail Company, the shipbuilding corporation had broken its contract by failing to repair the clapper valves in No. 2 hold, and a mere statement of the fact that the defective clapper valve let the water in compels the view that the ship was unseaworthy. It therefore devolved upon the steamship company to show that due diligence was exercised to make the ship seaworthy under the pertinent provisions of the bill of lading.

[1, 2] As between the Pacific Mail Company and the Gutradt Company, the duty of making the ship seaworthy was a nondelegable one; hence the steamship company could not successfully defend on the ground that it had made a contract with the shipbuilding corporation to repair and overhaul the clapper valves unless it could also show that the shipbuilding corporation had performed its contract. On the other hand the relationship between the steamship company and the shipbuilding corporation was of a different character. Duty to repair could be delegated and the contract to be performed by the shipbuilding corporation was broken in respect to the repair of the clapper valves, and as a consequence the steamship company was in no position to defend against the shipper. The Pacific Mail, therefore, had a cause of action against the shipbuilding corporation for reimbursement.

To what extent reimbursement may be had is an important point. The shipbuilding corporation urges that damages to the cargo were special, not recoverable under the evidence, while the steamship company contends that the damages naturally ensued from the breach of the contract for repairs.

In Mowbray v. Merriweather, 2 Q. B. 640, plaintiff stevedores contracted to discharge a cargo from a vessel owned by defendant, who was to supply chains. A chain used in the discharge of the cargo was defective and broke, injuring a workman, who brought action against the firm of stevedores. They made a settlement and brought action against the shipowners for breach of the implied warranty that the chain supplied by the owner would be fit for the uses intended. There was an admission that the stevedores might have discovered the defect by the exercise of reasonable care. Defendant took the ground that the damages claimed were too remote, and that plaintiff could not throw liability on the defendant for the consequence of the breach of the contract. Judgment was in favor of the stevedores, and in affirming it was held that injury to the stevedore from the breaking of the chain was within the contemplation of the parties, and that as between them and the owner of the ship the stevedores owed no duty to the owner to inspect the chain, and that the question of law on the subject was whether the damages could be regarded as the natural consequence of the defendant's breach of the contract, "or, in other words, a consequence which might reasonably be supposed to have been within the contemplation of the parties." Lord Esher was of opinion that plaintiff owed no duty to defendant to examine the chain before allowing it to be used, though they did owe a duty in that respect to the workman. See Alaska S. S. Co. v. Pacific Coast Gypsum Co., 128 P. 654, 71 Wash. 359.

In Pan-American Petroleum Co. v. Robins Dry Dock Co. (C. C. A.) 281 F. 97, the repairer contracted to overhaul the electric telegraph system of the ship, but when the ship was redelivered to the owner the wires were crossed, so that signals correctly given did not register correctly, and in consequence there was a collision. In a suit against the ship repairer for reimbursement, it was held that the repairer, having agreed to do the work, was obligated to use a degree of skill adequate to the undertaking. The court rejected the contention that the owner was negligent in failing to test the telegraph system after redelivery of the ship, taking the view that the shipowner had a right to assume that the repairer had properly made the repairs which it had agreed to make. Damages were ordered assessed in accordance with the "well-established principle governing bailments." The principle must have been that the repair company was responsi-

ble for all damages that naturally ensued from its breach of the contract.

Applied to the instant case, the principle embraces damages which the steamship company had to pay the shipper-because of the damaged cargo on account of the defective clapper valve.

In Ellerman Lines v. Smith Dry Dock Company, 18 Lloyd's List Law Rep. 172, the shipowner claimed a large amount as damages for alleged breach of contract in the repair of a steamer belonging to the plaintiff. The owner sent the ship to the defendant's place for certain repairs. Defendant failed to repair a discharge pipe. While at sea water entered into the hold and damaged part of the cargo. In a suit by the owner of the damaged cargo against the owner of the ship for damages, the cargo owners recovered a very large sum. In the action for the sum paid on the judgment against the repairer, repairer defended on the ground that he had not agreed to repair the particular valve which caused the leak, and that therefore there was no breach of contract, and that, even though there had been a breach of the contract, the damage was caused by the negligence of the · owner in failing to inspect the valve before loading the cargo, and in failure to take other measures to ascertain if the ship was dry or not. The court held that the repairer had not agreed to repair the valve through which the water entered and·that he was not liable. But in the discussion of what would have been the extent of the repairer's liability, if he had contracted to repair the valve in question, the court expressed the opinion that, if there had been such a contract as plaintiff had alleged, then liability would have followed for the full amount of the damages inflicted. Mowbray v. Merriweather, supra, was cited for that view.

[3] Appellant concedes that ordinarily the steamship company was under no duty to the repairer to inspect the clapper valves after the redelivery of the ship, but urges that that rule is inapplicable to this case, because the steamship company had knowledge sufficient to put it upon notice that quantities of water might enter the clapper valve in No. 2 hold. It is, of course, true that one valve was found to be defective and was repaired; but, if there was no duty owing to the repairer by the steamship company to inspect, upon what principle can the steamship company be held liable for not having inspected all the clapper valves in hold 2? Surely the answer is not in

saying that, because of the failure on the part of the repairer to fix the one valve that was found uncovered, there arose an obligation on the part of the steamship company to assume that there were other defective valves. Nor can we sustain the argument that the steamship company by the exercise of reasonable endeavor and exertion could have prevented the damages over and above the insignificant cost of repairing the clapper valves. The officers of the Ecuador, not being bound to anticipate the breach of the contract with the Bethlehem Corporation, were not guilty of negligence in their conduct.

Our understanding of the evidence is that the open clapper valve was the source through which the water flowed into the hold. The valve was under the water line when the loading was finished. We are not at all satisfied that the water was forced into the hold through the bilge lines.

Our conclusion is that the District Court was right in giving judgment in favor of the libelant against the steamship company, and in favor of the steamship company over and against the shipbuilding corporation.

Affirmed.